# United States Court of Appeals
## For the First Circuit

No. 12-2194

MICHELLE KOSILEK,

Plaintiff, Appellee,

v.

LUIS S. SPENCER, Commissioner of the
Massachusetts Department of Correction,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

Richard C. McFarland, Legal Division, Department of
Correction, with whom Nancy Ankers White, Special Assistant
Attorney General, was on brief, for appellant.
Frances S. Cohen, with whom Jeff Goldman, Christina Chan,
Bingham McCutchen LLP, Joseph L. Sulman, David Brody, and Law
Office of Joseph L. Sulman, were on brief, for appellee.
Andrew D. Beckwith on brief for the Massachusetts Family
Institute, amicus curiae in support of appellant.
Cori A. Lable, Daniel V. McCaughey, Kristin G. Ali, and Ropes
& Gray LLP on brief for World Professional Association for
Transgender Health, Mental Health America, Callen-Lorde Community
Health Center, Whitman-Walker Health, GLMA: Health Professionals
Advancing LGBT Equality, and Mazzoni Center, amici curiae in
support of appellee.
Joshua Block, Matthew R. Segal, and David C. Fathi on brief

for American Civil Liberties Union, American Civil Liberties Union of Massachusetts, Legal Aid Society, Harvard Prison Legal Assistance Project, Prisoners' Legal Services of New York, and Prisoners' Legal Services of Massachusetts, amici curiae in support of appellee.

Jennifer Levi and Bennett H. Klein on brief for Gay & Lesbian Advocates & Defenders, EqualityMaine, Human Rights Campaign, MassEquality, Massachusetts Transgender Political Coalition, National Center for Transgender Equality, National Gay & Lesbian Task Force, and Transgender New Hampshire, amici curiae in support of appellee.

---

January 17, 2014

---

-2-

**THOMPSON, Circuit Judge**.    Twenty years after prison inmate Michelle Kosilek first requested treatment for her severe gender identity disorder, the district court issued an order requiring the defendant, Luis S. Spencer, Commissioner of the Massachusetts Department of Correction (the "DOC"),[1] to provide Kosilek with sex reassignment surgery.    The court found that the DOC's failure to provide the surgery — which was said by a group of qualified doctors to be medically necessary to treat Kosilek's condition — violated Kosilek's Eighth Amendment rights.    The DOC appeals the district court's order.    Having carefully considered the relevant law and the extensive factual record, we affirm the judgment of the district court.

## I. BACKGROUND

### A. Gender Identity Disorder and Sex Reassignment Surgery

The concepts of gender identity disorder and sex reassignment surgery sit center stage in this case and feature prominently in this opinion.    Therefore, before we go any further, we provide a little context.    As this court has explained, gender identity disorder is "a psychological condition involving a strong identification with the other gender."    Battista v. Clarke, 645 F.3d 449, 450 (1st Cir. 2011).    It is a disorder recognized by the American Psychiatric Association, which describes gender identity

---

[1] For ease of reference we will speak of the defendant as the DOC, since the DOC's commissioner has changed multiple times during the life span of Kosilek's lawsuits.

disorder as having two components.  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition - Text Revision 576 (2000) ("DSM-IV-TR").[2]  The first is "evidence of a strong and persistent cross-gender identification, which is the desire to be, or the insistence that one is, of the other sex." Id.  The second is "evidence of persistent discomfort about one's assigned sex or a sense of inappropriateness in the gender role of that sex."  Id.

This current diagnosis of gender identity disorder grew out of an earlier diagnosis of transsexualism, which first appeared as an official disorder in the third edition of the DSM, published in 1980. Judith S. Stern & Claire V. Merkine, Brian L. v. Admin. for Children's Services: Ambivalence Toward Gender Identity Disorder as a Medical Condition, 30 Women's Rts. L. Rep. 566, 567-68 (2009).  In the 1950s and 1960s, research began to show that a "combination of psychotherapy, hormone treatment, and surgical reconfiguration of the genitalia" could be used to treat gender identity disorder.  Id. at 571.  This idea gained traction in the 1960s and 1970s, id., and as we will discuss more fully below, this

---

[2] DSM-IV-TR, the version applicable in Kosilek's cases, uses the term gender identity disorder. A newer edition, DSM-5, was released in May 2013.  DSM-5 replaces the term gender identity disorder with gender dysphoria to avoid any negative stigma.  See American Psychiatric Ass'n, Gender Dysphoria, http://www.dsm5.org/Documents/Gender%20Dysphoria%20Fact%20Sheet.pdf (last visited Jan. 16, 2014).  Because the term gender identity disorder was used throughout Kosilek's cases and was the then-appropriate nomenclature, we will use that term.

triadic approach is still utilized by many practitioners today. Sex reassignment surgery in particular has been performed in North America since at least the 1950s, and it has been estimated that as of January 2006, 30,000 sex reassignment surgeries have been performed in the United States.  Id. at 571-72.

With this bigger picture in place, we move on to the facts of this case.  We again note that this case has an over twenty-year history.  This has included two trials and two lengthy, fact-intensive decisions issued by the district court, the latter of which is the subject matter of this appeal.  Because of this, and because the district court's opinion was so fact-intensive, it is necessary for us to lay out a good deal of background.

## B. Kosilek's Conviction

Michelle Kosilek, née Robert, who is sixty-four years old, was born and still is anatomically male.  Kosilek suffers from gender identity disorder.  This has resulted in Kosilek's long-held belief that she[3] is a woman cruelly trapped in a man's body.

Kosilek, who spent some of her childhood in an orphanage, suffered regular abuse as a child, in part because of her expressed desire to live as a girl.  As she grew older, she alternated between living as a man and a woman.  Kosilek's teenage and early

---

[3] We will refer to Kosilek as her preferred gender of female, using feminine pronouns.

adult years were marred by arrests, incarcerations, beatings, heavy drinking, drug use, and a stint as a prostitute.

Sometime in the 1980s, Kosilek married Cheryl McCaul, a volunteer counselor at a drug rehabilitation facility, who Kosilek met while being treated there. McCaul thought she could cure Kosilek's gender identity disorder, but Kosilek's desire to be female did not go away. In 1990, Kosilek murdered McCaul. Kosilek fled the area but was ultimately apprehended in New York.

Kosilek awaited trial at the Bristol County Jail. While there, Kosilek, who had taken female hormones many years earlier, started taking female hormones (in the form of birth control pills) that she illicitly obtained from a guard. She also, at her own expense, consulted with a gender identity disorder specialist, though she was not allowed to undergo any treatment. While awaiting trial, Kosilek twice tried to kill herself; one attempt was made while she was taking the antidepressant Prozac. Kosilek also attempted self-castration.

Kosilek was eventually tried and, in 1992, was convicted of McCaul's murder and sentenced to life in prison without the possibility of parole. She was turned over to the DOC and since 1994 has been residing in the general population at MCI-Norfolk, a medium security male prison. There Kosilek started living, to the extent possible, as a woman, legally changing her name from Robert to Michelle.

## C. Kosilek's Lawsuits

In 1992, Kosilek filed a pro se complaint against the DOC in the United States District Court for the District of Massachusetts.[4]  See Kosilek v. Maloney, 221 F. Supp. 2d 156 (D. Mass. 2002) ("Kosilek I").  Kosilek alleged the DOC was denying her adequate medical care in violation of the Eighth Amendment.  Kosilek sought damages and an injunction ordering that she be provided with sex reassignment surgery.  The case was assigned to Judge Mark L. Wolf, and proceeded for some years with the parties engaging in discovery and motion practice.

Meanwhile, in December 2000, having not yet received the relief she was seeking, Kosilek filed this case — a second pro se lawsuit against the DOC and some of its medical providers.  See Kosilek v. Spencer, 889 F. Supp. 2d 190 (D. Mass. 2012) ("Kosilek II").  Again the gravamen of Kosilek's complaint was that the DOC was denying her adequate medical care in violation of the Eighth Amendment by not providing her with sex reassignment surgery.  This case also went to Judge Wolf.

In February 2002, Kosilek's first lawsuit, Kosilek I, finally proceeded to a non-jury trial.  Due to some pretrial skirmishing, only Kosilek's claim for injunctive relief remained (her damages claim was gone).  The trial lasted a couple of weeks.

---

[4] Kosilek initially sued the Bristol County Sheriff, but later amended the complaint to include the DOC after she was transferred to its custody.

## D. The <u>Kosilek I</u> Decision

On August 28, 2002, Judge Wolf issued his decision. <u>See</u> <u>Kosilek I</u>, 221 F. Supp. 2d at 156. The court explained that to make out an Eighth Amendment violation, both an objective and a subjective component must be satisfied. In short, the objective component requires that the inmate has a serious medical need that has not been adequately treated. The subjective piece, on the other hand, focuses on the state of mind of the prison officials and requires that they were aware the inmate was at risk for serious harm.[5]

The court found that Kosilek suffered from a severe form of gender identity disorder that caused her great mental anguish. It went on to hold that this disorder was a serious medical need within the meaning of the Eighth Amendment. To address the issue of what types of treatment might be warranted, the court looked to the Harry Benjamin Standards of Care (the "Standards of Care"),[6] which it found to be the accepted protocols used by professionals

---

[5] We will go into much greater depth regarding the Eighth Amendment standard in our own analysis, but for now it suffices to introduce the concept of the two-pronged test.

[6] The operative version of the Standards of Care for both <u>Kosilek I</u> and <u>Kosilek II</u> is the Sixth Version, issued in February 2001. <u>See</u> Harry Benjamin Int'l Gender Dysphoria Ass'n, <u>Standards of Care for Gender Identity Disorders, Sixth Version</u> (2001). The Seventh Version came out in 2011 under a new name. World Professional Association for Transgender Health, <u>Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7</u> (2011) (the "Standards of Care, Version 7").

in the United States to treat gender identity disorder. The Standards of Care indicated that, depending on the severity of an individual's gender identity disorder, psychotherapy alone or psychotherapy along with the administration of female hormones could constitute sufficient treatment. In other instances, however, sex reassignment surgery was medically necessary. The court found that, despite DOC doctors recommending that Kosilek receive female hormones and possibly surgery, the DOC, which at the time was headed up by Commissioner Michael Maloney, had not provided Kosilek with any of the treatment prescribed by the Standards of Care.

The court chronicled the steps taken by Maloney to avoid providing Kosilek with treatment. First, when an expert hired by the DOC, Marshall Forstein, M.D., recommended psychotherapy and hormones for Kosilek, and also, that she be allowed to consult with a surgeon who specialized in sex reassignment surgery, the DOC terminated its relationship with Dr. Forstein. Maloney then made it clear to DOC doctors that he did not want to provide Kosilek or any transgender prisoner with hormones or surgery, and the DOC proceeded to find a Canadian doctor, Robert Dickey, M.D., who believed inmates should never be considered for sex reassignment surgery. Dr. Dickey advocated a "freeze-frame" policy whereby transgender individuals would be frozen in the frame in which they entered prison. For instance, only persons receiving hormones

before they were in prison would get hormones in prison.  Despite Maloney having little familiarity with the rationale behind Dr. Dickey's philosophy on the treatment of gender identity disorder, and not having read the Standards of Care, Maloney adopted Dr. Dickey's freeze-frame policy for the DOC.

Dr. Dickey testified at trial, but the court did not find him persuasive because he did not subscribe to the Standards of Care, which the court found that prudent professionals follow, and his approach did not allow for individual assessment.  The court found Kosilek's experts credible and relied on their testimony to find that the objective component of the Eighth Amendment had been satisfied, namely that Kosilek had a serious medical need that had not been adequately treated.

But the court found Kosilek had fallen short of establishing an Eighth Amendment violation because the subjective component of deliberate indifference had not been satisfied. Maloney, the court concluded, knew many facts from which he could have inferred Kosilek would suffer serious harm if her gender identity disorder was not treated, but he did not actually draw that required inference.  Instead Judge Wolf found Maloney's refusal to allow Kosilek treatment was "rooted in sincere security concerns, and in a fear of public and political criticism as well." The end result: because there was no Eighth Amendment violation, the court did not order the DOC to do anything.

Nonetheless, Judge Wolf expected it would do something. He wrote: "This court's decision puts Maloney on notice that Kosilek has a serious medical need which is not being properly treated. Therefore, he has a duty to respond reasonably to it. The court expects that he will."

### E. The After-Effects of <u>Kosilek I</u>

Following the court's dictate, lots of activity ensued at the DOC. First, the DOC lifted its freeze-frame policy around December 2002. In its place went a policy allowing inmates suffering from gender identity disorder to receive a level of treatment commensurate with that which they were receiving upon entering prison (including receipt of hormones), but also providing for increased or decreased treatment if it was determined to be medically indicated by the University of Massachusetts Correctional Health Program ("UMass"), the entity under contract with the DOC to provide medical (including mental health) services to all inmates. Prior to the implementation of any progressive or regressive treatment changes, the DOC's Director of Health Services and the Commissioner were required to consider whether the changes would result in any safety or security concerns.

A couple of months later, in February 2003, the DOC brought in a gender identity specialist, David Seil, M.D., to

evaluate Kosilek.[7]  Dr. Seil interviewed Kosilek and reviewed her medical records, and then conveyed his findings and recommendation in writing.  Per DOC policy, which required any recommendations involving gender identity disorder to go to both UMass's Medical Director and its Mental Health Program Director, the report went to Kenneth Appelbaum, M.D., who held the latter position.

Dr. Seil wrote the following.  Like Drs. Forstein and Dickey before him, he diagnosed Kosilek with gender identity disorder.  He found Kosilek's "gender dysphoria[8] intense," and though Kosilek had done what she could to obtain relief by living as a woman, her basic disorder had been left untreated during her incarceration.  Dr. Seil, who noted that Kosilek had been living as a woman in a male prison without security issues thus far, indicated that the Standards of Care "need[ed] to be observed."  He further found that Kosilek was not currently suicidal because she then felt some power over her pursuit of becoming a woman.

---

[7] UMass's policy was to utilize consultants in matters that went beyond the expertise of its direct staff.

[8] Dr. Seil, and various other medical providers involved in this case, sometimes use the term gender dysphoria.  As indicated previously, the American Psychiatric Association now uses this term in place of gender identity disorder.  The current version of the Standards of Care says gender dysphoria is "broadly defined as discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth."  Standards of Care, Version 7, at 2.  It is not certain whether the medical providers in this case were all using the term gender dysphoria to mean precisely the same thing but, at a minimum, it appears they were all using it similarly.

-12-

Dr. Seil made several recommendations. First, Kosilek should be provided with estrogen therapy, electrolysis (specifically, permanent facial hair removal), and access to gender-appropriate personal items, such as female clothing and make-up. Additionally, Kosilek should be allowed to see the therapist she had been treating with, master's-level psychologist Mark Burrowes, more often than once a month. Further, feminizing procedures, such as rhinoplasty (plastic surgery performed on the nose) or breast augmentation, should be considered in the future. Finally, Dr. Seil noted that sex reassignment surgery was the last step in treating gender identity disorder. He explained that, as provided in the Standards of Care, an evaluation of the necessity of the surgery must wait until after a patient has lived as a woman for at least a year.[9] While Kosilek had been living as a woman for many years, she had not had the benefit of hormone therapy and electrolysis. Therefore Dr. Seil recommended that after Kosilek had a year of hormone treatment under her belt, an experienced gender identity specialist should evaluate her to determine whether surgery was needed.

---

[9] Dr. Seil was referring to the fact that the Standards of Care require that prior to receiving sex reassignment surgery, a person must live full-time for one year in the preferred gender role. This requirement is commonly called the real-life experience, and it is something we will discuss in more detail later.

The DOC began implementing Dr. Seil's recommendations. In April 2003, Kosilek started treating with an endocrinologist to develop a hormone therapy treatment plan. Concomitantly, per DOC policy, the security implications of Kosilek receiving hormones were assessed. On July 29, 2003, Luis Spencer, now the DOC Commissioner but then the Superintendent of MCI-Norfolk, reported to then DOC Commissioner Maloney that he did not believe there were any current security concerns with Kosilek being provided estrogen therapy, but once Kosilek began to exhibit physical changes security concerns might have to be reevaluated.

And so on August 26, 2003, Kosilek began female hormone treatment. Then, starting in October 2003, Kosilek was provided with certain gender-appropriate items, such as female undergarments and make-up. As neither Dr. Seil nor the endocrinologist Kosilek was treating with had made specific recommendations as to whether feminizing procedures were needed, none were provided. The DOC did find a facility willing to provide Kosilek with electrolysis and, after a security review of the facility was conducted, electrolysis treatments were scheduled for November the following year.

In December 2003, Kathleen Dennehy, who had been the DOC's Deputy Commissioner under Maloney, was elevated to Commissioner. Right away she informed the staff she wanted to

-14-

"regroup on this GID stuff."[10]   And she wanted Kosilek reevaluated before approving "laser hair removal or anything else."[11]

As of September 2004, Kosilek had been on hormones for a year and, pursuant to the Standards of Care and Dr. Seil's recommendation, was eligible to be evaluated for sex reassignment surgery.  The issue of conducting evaluations for prisoners with gender identity disorder was taken up at executive staff meetings, attended by UMass and DOC personnel, around this time.  Those typically in attendance from the DOC included Susan Martin, the DOC's Director of Health Services, and Gregory Hughes, the DOC's Director of Mental Health and Substance Abuse Services, as well as a couple other DOC officials.  Representing UMass was its Mental Health Program Director Dr. Appelbaum, along with some additional UMass personnel.

At one meeting, Dr. Appelbaum spoke about retaining the Fenway Community Health Center (the "Fenway Center"), a Boston healthcare facility focused on serving the lesbian, gay, bisexual, and transgender community.  Hughes, however, had some reservations; he felt the Fenway Center might be too sympathetic to the prisoners and too quick to recommend treatment.  Dr. Appelbaum countered, stating the Fenway Center's approach represented the norm rather

---

[10] "GID" is an acronym for gender identity disorder.

[11] It is unclear from the record what happened, if anything, based on Dennehy's desires to regroup and reevaluate.

-15-

than the exception and there really were not many other providers in the area with whom to consult. Hughes said he had spoken with a Johns Hopkins gender identity specialist, Cynthia Osborne, a licensed social worker, who was working with the Virginia and Wisconsin departments of corrections, which had also been sued by transgender prisoners. It was noted on the meeting minutes that Osborne "may do more objective evaluations," and was "[m]ore sympathetic to DOC position."

Despite Hughes's qualms about the Fenway Center and the possible option of using Osborne, the DOC went ahead with retaining the Fenway Center. Kosilek was evaluated by Kevin Kapila, M.D., and Randi Kaufman, Psy.D., who conducted a ninety-minute interview with her and reviewed her medical records. The doctors issued their report with several findings on February 24, 2005 (the "Fenway Report"). As had been documented in the past, Kosilek "clearly fit[]" the diagnosis for gender identity disorder. Kosilek had been on hormone therapy and living full-time as a woman for seventeen months by that time. Kosilek's ability to live as a woman, her good behavior, and her absence of conflict with others, suggested, according to the doctors, an "intense motivation, as well as a real adaptability to her environment." They noted her favorable response to the use of hormones, electrolysis, and use of feminine products. But, they noted, Kosilek was still "quite distressed," and given Kosilek's "previous suicide attempts, her

ongoing distress, and lack of other goals in her life," the doctors found it was quite likely Kosilek would attempt suicide again if she was not provided with sex reassignment surgery. Kosilek had a serious medical need, they felt, and there was a substantial risk of harm if her disorder was left untreated.

The report went on to note that Kosilek had moved successfully through the steps outlined in the Standards of Care, there had not been any adverse reactions to Kosilek's feminized appearance, and Kosilek had benefitted psychologically from her changes. Drs. Kapila and Kaufman concluded Kosilek was likely ready for sex reassignment surgery. The surgery, the doctors opined, would provide Kosilek with full relief from the symptoms of gender identity disorder and likely increase her chance of survival. The ultimate recommendation of the specialists retained by the DOC as advised by its own doctors: Kosilek should be given the surgery.

Unhappy with the Fenway Report, the DOC turned to the Johns Hopkins gender identity specialist, Cynthia Osborne, whose name had been batted around at the earlier DOC meeting. The DOC asked Osborne to conduct a peer review[12] of the Fenway Report and

---

[12] Peer review is the term used by the DOC — we presume because social worker Osborne was tasked primarily with reviewing the recommendation of her so-called peers, the Fenway Center doctors, as opposed to interviewing Kosilek and conducting an independent assessment.

she agreed.  The report, along with other evaluations conducted of Kosilek, were sent to Osborne on April 12, 2005.

In the meantime, on April 15, 2005, Dr. Appelbaum, who at the time was a defendant in this lawsuit along with UMass and some other doctors, filed (at the district court's request) a status report.  It advised the court of Drs. Kapila and Kaufman's sex reassignment surgery recommendation for Kosilek.  Dr. Appelbaum also said he had advised the DOC of the doctors' recommendation and had informed them he was unaware of any medical reason why Kosilek should not receive the surgery.

The court responded with an April 25, 2005 order directing the DOC to provide a report addressing potential security concerns should Kosilek undergo the surgery.  It also directed the DOC to indicate whether it was going to provide Kosilek with the surgery recommended by the Fenway Center doctors.

A few days later, on April 28, 2005, the DOC responded to the UMass status report.  The letter was penned by Susan Martin (recall she was the DOC Director of Health Services) and sent to Dr. Appelbaum and UMass's Medical Director, Arthur Brewer, M.D. (also a defendant).  Dennehy and other DOC officials were copied. Martin maligned Dr. Appelbaum's status report, asserting that the DOC did not consider it an adequate review of the Fenway Report or a clear explanation of UMass's recommendation.  Martin requested that the UMass doctors make clear whether they thought Kosilek

should be operated on.  She also wanted answers to various questions relating to, among other things, the surgery's logistics, such as who would perform it, the recovery process, and the success rate.

Drs. Appelbaum and Brewer, in a May 10, 2005 response letter to the DOC, clarified their stance on the Fenway Report.  As they explained, UMass deferred to the Fenway Center and stood behind the doctors' sex reassignment surgery recommendation for Kosilek.  They were aware of no mental health barriers to Kosilek being operated on and the next step was finding a surgeon.  It appeared there were no physicians in Massachusetts who could perform the surgery, so some out-of-state practitioners were suggested.  The doctors also offered to look into the logistics of providing the surgery.

In the interim, Osborne completed her review of the Fenway Report.[13]  She chronicled her findings in a report dated May 20, 2005, which she sent to the DOC.  It began with the caveat that Osborne had not conducted a clinical evaluation of Kosilek and her report was based solely on her review of the Fenway Report and some of the other evaluations of Kosilek.  Though she did not doubt

---

[13] We pause to say a little more about Osborne's qualifications.  According to her C.V., at least as of 2006, she held a master's degree in education and social work.  Osborne was also an assistant professor of psychiatry at Johns Hopkins University School of Medicine and on the consulting faculty of the University's Center for Sexual Health and Medicine.

Kosilek met the criteria for gender identity disorder, Osborne went on to lodge numerous criticisms against Drs. Kapila and Kaufman's approach.

First, Osborne disparaged the Fenway Report for not addressing the issue of whether Kosilek was suffering from any personality disorders. She opined that "[c]larity regarding the presence, absence, nature and severity" of any personality disorder, especially given that clinicians had at one point diagnosed Kosilek with antisocial personality disorder, was critical because its presence could complicate a gender identity disorder diagnosis. Osborne also argued that threats of suicide and self-harm signal serious mental illness apart from gender identity disorder, which demands treatment and, in fact, counsels against providing sex reassignment surgery. She thought the Fenway Report had given short shrift to this issue.

Osborne then turned her focus to the Standards of Care, expressing her concerns that they did not translate well into a prison environment. She wrote: "In my view, providing surgery, or even hormones, to incarcerated individuals, is an undeniable lowering of the Standards, and an explicit violation of the criteria regarding sociopathy and suicidality." While Osborne recognized the Standards of Care as helpful, she noted they had no regulatory authority. Also, there was no universal consensus in the psychiatric community about what constituted medical necessity

in the treatment of gender identity disorder.  She criticized the Fenway Report for failing to address other possible treatment options for Kosilek or to provide an adequate explanation for its surgery recommendation.  Kosilek, in Osborne's eyes, had an unrealistic expectation that she was owed certain treatments and Kosilek would instead benefit from a thorough assessment for psychiatric disorders and treatment designed to address any such disorders along with her gender identity disorder.

On May 25, 2005, the back and forth between the DOC and UMass continued.  Martin sent Drs. Appelbaum and Brewer another criticism-laced letter.  While the doctors had answered some of the DOC's questions, they had not provided a comprehensive review of the appropriateness or necessity of surgery for Kosilek.  Citing the DOC's Eighth Amendment obligations, Martin lamented that neither UMass nor the Fenway Report had offered guidance on whether surgery was "a medical necessity for Kosilek."  Finally, Martin informed them of the DOC's engagement of Osborne to review the Fenway Report and enclosed a copy of Osborne's report.  Martin asked UMass to review the report and give the DOC its ultimate recommendation as to the appropriateness of surgery for Kosilek.

The same day Martin fired off her letter, a news piece, which was highly negative toward Kosilek and her quest for surgery, appeared on a local television station.  Commissioner Dennehy had been interviewed for the piece on May 16, and one of her comments

made it on air.[14]  A Massachusetts state senator, who had filed legislation seeking to prohibit the state from paying for sex reassignment surgery for inmates, also spoke to the reporter. "When you go to prison you lose some rights.  You also lose your rights to get a sex change operation," he stated.  The senator, who was an acquaintance of Dennehy, had called Dennehy on her cell phone to advise her that he would be participating in the news piece.  The piece concluded with the reporter indicating: "Later this week, the state will tell the federal court that sex surgery for Michelle Kosilek would result in a security nightmare."[15]

Despite the security concerns the DOC expressed to the media, Dennehy and her staff had yet (as of the time she was interviewed) to officially convene to conduct their internal security review.  Not until May 19, three days after her interview, did they actually meet.  In attendance were Dennehy, DOC counsel, Superintendent Spencer of MCI-Norfolk, and Superintendent Lynne Bissonnette of MCI-Framingham, the women's prison where Kosilek might be sent were she to undergo surgery.  Dennehy did not have the benefit of written reports from Spencer or Bissonnette, despite

_____

[14] She was quoted: "The courts are telling us that medical professionals make medical recommendations and correctional administrators assess the safety and security concerns."

[15] It seems likely that the reporter learned this information from Dennehy herself, though it is unclear whether it could have come from someone on her staff.  Either way the DOC does not dispute that this tidbit came from within the DOC.

DOC policy calling for the superintendents to make such recommendations, because (as Dennehy later testified) the security concerns seemed self-evident.

On June 10, 2005, the DOC brought the court back into the loop, finally filing the status report which the court had ordered back on April 25. The DOC informed Judge Wolf it had decided not to provide Kosilek with sex reassignment surgery. In support of its decision, the DOC attached Osborne's report. It also attached the court-ordered security report, which was principally authored by DOC attorneys with input from Dennehy.

The security report, which said it was based on Dennehy's thirty years of correctional knowledge and experience, as well as the experience of colleagues she had spoken with, stated the following. Allowing the surgery to go forward "would create substantial safety and security problems for DOC." She claimed that out-of-state surgery, which appeared to be the only option based on a dearth of doctors in Massachusetts, would cause "complex security and logistical issues" and might give Kosilek a chance to escape custody. Kosilek's post-surgery confinement was also a cause for concern. Dennehy argued Kosilek would be at risk for sexual assault if she were to remain in a male prison, and housing her in a female prison would come with its own host of problems. Specifically, Dennehy anticipated "serious climate issues" since the majority of the women at MCI-Framingham had histories of trauma

and it was well known that Kosilek had killed her wife. The women might pose a threat to Kosilek and vice versa. Kosilek would need to be isolated and restrictively confined in either prison and this, Dennehy concluded, might be deleterious to Kosilek's mental health. Citing these concerns, along with what she perceived as an unclear stance from UMass on whether surgery was necessary,[16] and given Osborne's critiques of the Fenway Report, Dennehy indicated that the DOC was denying Kosilek's request for surgery.

After the status report was filed with the court, the DOC and UMass continued to clash over what the DOC perceived to be UMass's equivocations. Drs. Appelbaum and Brewer directed a June 14, 2005 letter at the DOC. Calling the DOC's statements in its previous letters and status report "disingenuous," the doctors emphasized that it was not within their purview to decide whether surgery is medically necessary for Kosilek as that term is contemplated by the Eighth Amendment. UMass, they explained, had consistently relied on the expertise of outside consultants, all of whom had said the same thing. The doctors again underlined that solely from a clinical perspective it appeared that Kosilek should be offered surgery.

---

[16] The report quoted the supposedly ambiguous language from UMass's letter: "the treatment recommended in the Fenway report . . . appears to be reasonable and appropriate, since the patient has met criteria for the diagnosis of gender identity disorder and has reached a point in clinical treatment where sexual reassignment surgery, if desired, would be the next step."

On October 7, 2005, Drs. Kapila and Kaufman prepared and issued another report, this one a response to Osborne's critiques of their Fenway Report, which they sent to UMass and which UMass passed on to the DOC. Citing medical literature and studies, the doctors took aim at Osborne's criticisms, explaining why her challenges to their recommendation for surgery were clinically unfounded or irrelevant. The report also argued that Kosilek was stable, not currently suicidal, and a good candidate for surgery. The doctors strenuously insisted that their recommendation of surgery was an informed clinical judgment rooted in Kosilek's gender identity disorder diagnosis, her marked mental health improvement since being provided hormones and being allowed to live as a woman, and the well-documented effectiveness of surgery. The doctors reiterated their recommendation that Kosilek be provided with the surgery. Dr. Appelbaum submitted this report to the DOC on October 17, 2005, restating UMass's endorsement of the original Fenway Report's recommendations and requesting that the DOC issue a decision approving those recommendations.

As to the status of Kosilek's lawsuit, as of July 2005, Kosilek had let all the medical provider defendants (Drs. Appelbaum and Brewer, and UMass, among others) out of the case. That same month she filed an amended complaint, this time with the benefit of an attorney, with Dennehy as the sole named defendant. Kosilek no longer sought damages, she only requested injunctive relief

requiring the DOC to provide her with adequate medical care, including sex reassignment surgery. The case went to trial a little less than a year later.

## F. The Kosilek II Trial

### 1. Round One of Testimony

The non-jury trial, which like Kosilek I was presided over by Judge Wolf (by then Chief Judge), began on May 30, 2006. Testimony initially went until the end of June, with multiple witnesses testifying.[17]

First the court heard from George Brown, M.D., a practicing psychiatrist who helped author the Standards of Care, and who testified as an expert on Kosilek's behalf (he also testified in Kosilek I). As he had done back in 2001, Dr. Brown evaluated Kosilek and reviewed her medical records. He prepared a written report, and in it diagnosed Kosilek with chronic and severe gender identity disorder. He did not think she met the criteria for antisocial personality disorder. Dr. Brown also did not think Kosilek was trying to game the system, writing that he was "hard pressed to develop a rational explanation for why someone would work so fervently to obtain this serious, painful surgery" other than as a means to treat gender identity disorder. Dr. Brown also opined that Kosilek had met or exceeded the readiness criteria for

_____

[17] We summarize the testimony in the order it was given, save for Dr. Schmidt. He actually testified before Kosilek finished putting on her witnesses (we assume for scheduling convenience).

-26-

sex reassignment surgery. Among other things, she had completed a more than two-year monitored, real-life experience living as a woman while incarcerated. Further, he wrote, Kosilek had "received an unambiguous diagnosis of severe gender identity disorder from no fewer than nine mental health professionals who have interviewed her, many of whom are recognized international experts in the field of gender identity disorder." Dr. Brown stressed, "[n]o further treatment or real-life experience is necessary," and Kosilek should receive the surgery, which Dr. Brown deemed "medically necessary."

Hammering the point home, Dr. Brown testified, consistent with his written report, that the hormones and psychotherapy Kosilek was receiving, though they had helped relieve her dysphoria, were "[a]bsolutely not" sufficient to eliminate the serious risk of harm Kosilek faced, up to and including suicide. When asked whether sex reassignment surgery was medically necessary, Dr. Brown stated: "Absolutely. If I can walk away from these proceedings with one point being clear in people's minds, it's that." Without surgery, he added, "the degree of likelihood of [Kosilek] suffering serious medical consequences up to and including suicide are exceedingly high." As for antidepressants, they are for the treatment of patients with major depressive disorder, which Dr. Brown stressed Kosilek did not have. With regards to gender identity disorder, such antidepressant medications had been shown to be "very ineffective" as they might

only slightly relieve some depressive symptoms but would not treat the underlying gender identity disorder. Only surgery, Dr. Brown testified, had the "significant potential" to cure Kosilek's medical condition.

Next came Dr. Kenneth Appelbaum's testimony. The Fenway Center doctors, he said, had significant experience in the area of gender identity disorder and were well-trained, credentialed, and knowledgeable. He thought their assessments were typically reasonable and consistent with the approaches followed by most other medical providers. In general, Dr. Appelbaum did not see why the DOC would need to consult with Osborne (an out-of-state, master's-level social worker) given that it had already received the recommendations of the Fenway Center doctors (a local physician and doctoral psychologist), who were, in Dr. Appelbaum's mind, highly experienced in dealing with gender identity disorder. As for Osborne, Dr. Appelbaum recalled that the DOC's Hughes had commented that she would be more sensitive to the DOC's concerns because she did not believe sex reassignment surgery was appropriate in the corrections setting. Finally, Dr. Appelbaum testified that from his conversations with Kosilek's treatment team at the prison, it was his understanding Kosilek had shown good adjustment being on hormones and receiving therapy.

Dr. Randi Kaufman from the Fenway Center then took the stand. She reiterated the conclusion she made in her report, in

particular that Kosilek had successfully completed the real-life experience contemplated by the Standards of Care. She also testified that, to a reasonable degree of medical certainty, there was a "very high likelihood" Kosilek would attempt suicide if denied treatment for her gender identity disorder. Though Kosilek benefitted from being on hormones, Dr. Kaufman felt Kosilek had a level of gender identity disorder that could not be treated with anything less than surgery. "She's done all the things that people do to change their gender presentation," she said, and "[t]here really isn't anything left except for surgery." Kosilek had a medical need for the surgery.

Mark Burrowes, a licensed mental health counselor with a master's degree in counseling psychology, who had been treating Kosilek for four or five years, also testified. Kosilek, he agreed, was ready for sex reassignment surgery. Not having the surgery would be detrimental and could result in Kosilek making an attempt on her life. Suicide monitoring would not be an adequate alternative to surgery since Kosilek's male genitalia still caused her distress.

Finally, Michelle Kosilek was called by her attorneys. She spoke about her life at MCI-Norfolk. Generally she got along quite well with most of the people there, though a small percentage of the correction officers gave her a hard time. Kosilek had, since she got to prison, worked on a daily basis. She testified

that the hormone treatments had made her a little less depressed but she continued to feel distress over her body. Kosilek, who said she was not currently suicidal, felt the hormones were not enough and she needed surgery. She did not want to continue living with her male genitalia and, if denied surgery, antidepressants and psychotherapy would not help matters.

The DOC then put on its case. First, Chester Schmidt, M.D., a psychiatrist at the Johns Hopkins School of Medicine, and associate director of the Johns Hopkins Center for Sexual Health and Medicine, testified as an expert for the DOC. He became involved in this case through his connection with Cynthia Osborne. As to his general approach for treating patients with gender identity disorder, Dr. Schmidt stated he does utilize the Standards of Care but thinks of them more as protocols or guidelines, as opposed to actual standards of care. He does not agree with the idea, set forth in the Standards of Care, that sex reassignment surgery is medically necessary in patients with severe gender identity disorder. In fact, Dr. Schmidt did not recall ever seeing a case where he thought surgery was medically necessary. It was his and his Johns Hopkins colleagues' practice to neither advocate nor speak against a patient's desire for surgery, but to leave it in the hands of the patient. He would not send a letter of recommendation to a surgeon on behalf of a patient, but he would

release his file to the surgeon and simply indicate he saw no contraindications to surgery.

After giving his general overview, Dr. Schmidt turned his focus to Kosilek, whom he had personally evaluated in November 2005. Kosilek did meet the criteria for gender identity disorder, he concluded. However, Dr. Schmidt did not believe surgery was medically necessary as Kosilek, he theorized, had made an "excellent adaptation" without surgery thus far. He also felt the real-life experience contemplated in the Standards of Care was virtually impossible to replicate in prison. But besides this barrier, Dr. Schmidt admitted he did not see any contraindications to surgery. Should Kosilek become depressed if she did not receive the surgery, Dr. Schmidt thought she could be treated with antidepressants and psychotherapy, and managed in a medical facility should her suicidal desires become severe. This latter scenario was a possibility, as Dr. Schmidt recognized Kosilek's risk of suicide based on what she had said and done in the past. But, Dr. Schmidt opined, psychotherapy and medications could effectively reduce Kosilek's dysphoria to a level where she was no longer at risk for serious harm.

Next Cynthia Osborne, the Johns Hopkins social worker and DOC consultant, gave testimony echoing Dr. Schmidt. By the time of trial, she had met with and interviewed Kosilek. Osborne agreed with Kosilek's severe gender identity disorder diagnosis. Yet,

-31-

like Dr. Schmidt, in general, she did not believe the real-life experience called for by the Standards of Care could happen in a prison environment. Also, Kosilek was not, in her opinion, a good candidate for sex reassignment surgery, nor was it medically necessary, because Kosilek had responded very well to hormone treatment. Rather, Osborne thought support groups or group therapy could be used to treat Kosilek effectively. Kosilek's threats of suicide if denied surgery did not change Osborne's mind on what treatment was warranted. Indeed, she minimized concerns about suicide by noting that any good mental health system would know how to deal with a patient's suicidality. Osborne, again like Dr. Schmidt, did not fully agree with the Standards of Care's statement that sex reassignment surgery is medically necessary in cases of severe gender identity disorder.

Luis Spencer, then still Superintendent of MCI-Norfolk, also testified for the DOC. He explained the set-up at MCI-Norfolk, describing it as having one of the more secure perimeters in Massachusetts. It is surrounded by walls on all sides, an electrified fence, and guard towers which are manned twenty-four hours a day, seven days a week. Approximately one-third of the inmates at MCI-Norfolk, Spencer explained, are serving a life sentence and one-third have committed sexual felonies.

Spencer also testified about Kosilek. She had adjusted fairly well to life at MCI-Norfolk and had not reported any threats

or harassment from other inmates. As of the time of trial, no security concerns involving Kosilek had arisen; however, Spencer had some apprehension going forward should Kosilek receive the surgery. He would have "grave concerns" putting Kosilek back in the general population with the full anatomy of a female. Spencer worried that she could be raped or assaulted and he saw no alternative but to house her in the high-security Special Management Unit. This unit was a standalone secure building where Kosilek would remain in her cell twenty-three hours a day and could only leave when shackled and escorted by two guards. The questioning also briefly touched on Kosilek's threats of suicide were she not to receive the surgery. Spencer said his policy is not to negotiate with inmates who threaten suicide, as to do so would undermine his and the staff's authority. Rather, he would implement the DOC's mental health policy and take the appropriate steps to guard a suicidal inmate's safety.

Gregory Hughes, who was the DOC's Director of Mental Health and Substance Abuse Services until 2005, and who holds a master's degree in social work, was questioned next. Hughes testified about the aftermath of Kosilek I and the DOC's efforts to comply with the court's decision. His role included overseeing and facilitating the services supplied to Kosilek, and in particular making happen the independent evaluation Judge Wolf ordered in Kosilek I. He testified about his dissatisfaction with the Fenway

Report, questioning its thoroughness and its heavy reliance on Kosilek's self-reporting. He was concerned that the doctors had not reviewed any of Kosilek's medical records or mental health history or interviewed other people to verify Kosilek's self-reports. And while Hughes knew the doctors suggested surgery, he said he was uncertain about whether there were other recommendations and what next step the DOC should take. Because he was concerned with the Fenway Report's quality, Hughes had decided to contact Osborne. Hughes also testified that he reported his concerns about the report to Drs. Appelbaum and Brewer and that the DOC sought their thoughts during staff meetings. Hughes recalled the doctors saying there were no contraindications to surgery but did not believe they used the term "medically necessary."

Robert Dumond, who was the Director of the DOC's Research and Planning Division, and who had previously provided mental health screenings at MCI-Framingham, testified on the DOC's behalf. Dumond, who had a master's degree in psychology and experience in the areas of victimization and sexual assault in the prison system, was asked by the DOC to consider the risk factors for post-operative individuals in prison. Placing Kosilek at MCI-Framingham post-surgery, he responded, could "destabilize[] the safety and security of the institution" and create a risk for Kosilek to become a victim or victimizer.

Arthur Beeler was also called by the DOC to testify about security issues. Beeler, a thirty-year employee with the Federal Bureau of Prisons, was warden at the Federal Correction Complex, Federal Medical Center in Buckner, North Carolina. Beeler toured MCI-Norfolk and MCI-Framingham, spoke with Superintendent Spencer, and reviewed the DOC's mental health policies in preparation for his testimony. In his opinion, Kosilek was currently safe and secure at MCI-Norfolk, based in part on the set-up of the facilities and her cell and the fact that Kosilek had never been assaulted there. Beeler indicated that he "would be very concerned" about placing Kosilek in the women's general population at MCI-Framingham and was satisfied that the mental health procedure at MCI-Norfolk was sufficient to address inmate suicide ideation and behavior. Beeler cautioned against giving in to an inmate's threats of suicide, likening it to opening Pandora's box. Beeler was not permitted to testify specifically about whether security concerns should preclude Kosilek from getting surgery because, the court found, he was not sufficiently informed about "the facts concerning Kosilek" because Beeler had not looked at her disciplinary or medical records.

Susan Martin, the DOC's Director of Health Services during the relevant time period, was next up. After speaking some about the contractual relationship between the DOC and UMass, Martin turned to the Fenway Center's evaluation of Kosilek. Like

Hughes, she was not satisfied with the evaluation.  Martin did not think the Fenway Report was very thorough and she raised this concern to UMass at the time.  Though Martin knew the Fenway Center doctors were recommending surgery, she did not think they were clear enough about what exactly needed to happen and when.  Because of these perceived omissions, Martin decided to have Osborne review the report.

When asked about UMass's role, Martin indicated she thought it was UMass's job to determine whether the Fenway Center's recommendations "were medically necessary and clinically sound," and UMass, she said, would not do this.  She considered it UMass's responsibility to find a surgeon, and simply providing the DOC with a list of possible surgeons was not sufficient.

Next came DOC Commissioner Kathleen Dennehy's testimony.  If faced with a court order compelling the DOC to provide Kosilek with sex reassignment surgery, Dennehy said she would probably retire before implementing something she considered unsafe.  And based "strictly [on] safety and security concerns" she said she would still veto the surgery even if UMass told her it was medically necessary and even if Kosilek would likely attempt suicide if denied the surgery.  (Dennehy claimed she was still awaiting clear direction from UMass.)

When asked, Dennehy acknowledged her awareness of the negative public attention that Kosilek's bid had been receiving.

-36-

She admitted she knew that a Massachusetts senator, who she was friendly with and who had spoken in the news piece, vocally opposed sex reassignment surgery for inmates and was pushing for legislation to put a stop to its provision. She also said she knew of the Massachusetts Lieutenant Governor's opposition to surgery for transgender inmates.

Finally, Lynne Bissonnette, Superintendent of MCI-Framingham, was called upon to discuss the feasibility of Kosilek's post-operative placement there. She explained the set-up at MCI-Framingham. The women lived in multi-person rooms or dormitory-style housing units, with the exception of the women in the segregation or medical units who had single cells. For the most part the buildings at MCI-Framingham were surrounded by a single, non-electrified twelve-foot-high fence. There had been, Bissonnette indicated, no prisoner escapes during her three-year tenure at Framingham.

As for the population at the facility, according to Bissonnette, a large majority of the women there had been victims of domestic violence or sexual assault. Also, a majority had mental health issues with about a half receiving medication for those issues. Bissonnette stated that if a woman could not effectively be maintained by the mental health professionals at the prison, she was sent for inpatient treatment at a Massachusetts Department of Mental Health facility, where security was not the

equivalent of what was provided at the prison. And whereas Massachusetts provides a special secure hospital for male prisoners, Bridgewater State Hospital, she explained that no comparative facility exists for women.

Bissonnette's testimony then turned to Kosilek specifically, whose criminal record she had reviewed. Bissonnette did not think Kosilek was an appropriate candidate to be housed at MCI-Framingham post-operatively and noted several concerns. First, Bissonnette considered Kosilek a flight risk based on the weak perimeter at MCI-Framingham, the length of Kosilek's sentence, and the fact that Kosilek had fled Massachusetts after killing her wife.[18] Second, Bissonnette worried about the lack of available inpatient mental health care. Kosilek would have to be sent to a less secure hospital for the general public should she require care. Third, Bissonnette considered Kosilek both a potential predator and victim within the inmate population — a predator because Kosilek had strangled her wife and a victim because a large proportion of MCI-Framingham's population had been the victims of domestic violence and sexual abuse and might seek to harm her. Further, and for essentially those same reasons, Bissonnette felt Kosilek would have a negative effect on the prison population.

---

[18] Bissonnette considered Kosilek's earlier flight, even though the DOC classification manual says pre-custodial flight should not be considered when classifying inmates.

In light of all of these concerns, were Bissonnette required to house Kosilek, she would put her in the Close Custody Unit, the single cell segregation unit, where inmates cannot hold any employment and are placed in restraints whenever they leave the cell. Since Kosilek is serving a life sentence, Bissonnette expressed concern that housing her in an environment this restrictive for such an extended period of time would have a negative impact on Kosilek's mental health.

On cross-examination Bissonnette made a few concessions. She agreed that MCI-Framingham currently houses approximately forty offenders who are serving life sentences for murder. Further, the institution houses in the general population inmates who are convicted of heinous crimes against children alongside prisoners who are mothers. Bissonnette explained that if inmates are perceived to experience trauma based on the presence of other inmates, there are policies and procedures in place to follow (such as simply ordering a cell transfer) and the mental health and security staff would respond appropriately. Though Bissonnette again acknowledged Kosilek could be housed in the Close Custody Unit safely, she persisted that this was not the "best setting for any inmate over a long period of time."[19]

---

[19] During the first round of testimony some more negative press came out. The Boston Globe ran an editorial on June 15, 2006, which took the position that Kosilek should not receive the surgery. The editorial referred to the "distastefulness of a wife killer angling to serve out his sentence of life without parole in

## 2. Responses to the First Round of Testimony

After the first bout of testimony, which concluded at the end of June 2006, Judge Wolf then directed the UMass doctors to review Dr. Schmidt's testimony and to inform the court whether the latter's proposed approach was within prudent professional standards. Drs. Appelbaum and Brewer responded in a report filed with the court on September 18, 2006. They continued to endorse the Fenway Center doctors' conclusion that Kosilek had a serious medical need requiring surgery. In their opinion, Dr. Schmidt's proposed alternative course of psychotherapy, medication, and suicide watch fell "outside the bounds of acceptable professional standards" and would not constitute "adequate medical care." Such interventions would "likely do little" to reduce Kosilek's dysphoria or the risk of harm to her. Only surgery, they concluded, could do this, and there was "no good clinical reason to withhold that treatment at this time."

The judge also ordered Dennehy to review the evidence presented at trial and decide whether the DOC would reverse its position on surgery for Kosilek. After doing so, Dennehy indicated to the court that Drs. Appelbaum's and Brewer's testimony confirmed what she suspected (but apparently did not previously find clear): that the doctors believed surgery was medically necessary. Dennehy stood firm though; she advised Judge Wolf that her decision not to

a women's prison."

allow sex reassignment surgery for Kosilek remained.  Her safety
and security concerns with providing surgery, which Dennehy called
"alarming and substantial," had not changed.

### 3. Second Round of Testimony

Testimony resumed in early October 2006, with various
witnesses taking and re-taking the stand.  First came Dr.
Appelbaum, who emphasized several points.  Kosilek had a serious
medical need because there was a serious risk of harm if she was
not adequately treated; and he had informed Dennehy of this.
Antidepressants were unlikely to effectively treat Kosilek because
the source of her distress was her gender identity disorder and
medication would not target this underlying condition.  Rather,
surgery, he explained, was the "recognized and appropriate
treatment" and the only treatment "likely to significantly relieve,
if not eliminate Miss Kosilek's distress."

Dr. Kevin Kapila from the Fenway Center also spoke.  He
called Kosilek's gender identity disorder "one of the more severe
cases" he had ever seen and he testified about the report he and
Dr. Kaufman had written.  In his opinion, Kosilek had a serious
medical need and there was a substantial risk of harm if she was
not treated with surgery.  Dr. Kapila also testified that he
thought Dr. Schmidt's recommendation was unreasonable.
Specifically, Dr. Kapila (who had reviewed Dr. Schmidt's testimony)
opined to a reasonable degree of medical certainty that Dr.

-41-

Schmidt's plan to treat Kosilek with psychotherapy and medication was inadequate. Pointing to his own evaluation of Kosilek after she had been receiving psychotherapy and hormones for seventeen months, Dr. Kapila noted her symptoms had still not resolved; "she still was dealing with discomfort around having male genitalia." Dr. Schmidt's approach would not deal with this core problem — only surgery could — and, Dr. Kapila continued, one tries to treat the problem, not merely the symptoms.

Dr. Kaufman then got recalled. While she agreed Kosilek's dysphoria had improved as a result of receiving hormone treatments and gender-appropriate items and clothing, Dr. Kaufman persisted in opining that Kosilek still had a serious medical need and if she did not receive surgery there was a substantial risk of serious harm. Despite all the treatment Kosilek had received, she still continued to experience severe dysphoria. Like Dr. Kapila, Dr. Kaufman did not think the treatment advocated by Dr. Schmidt was adequate. It is important to distinguish between depression and dysphoria, she said, and Dr. Schmidt's treatment would not sufficiently address the latter.

UMass's Medical Director, Dr. Arthur Brewer, was up next. He had little to add to the testimony of the other medical providers because, as medical director, he was not involved in UMass's mental health program and had no role in Kosilek's treatment. His position remained the same as in his and Dr.

Appelbaum's September 18, 2006 letter, which supported the Fenway Center doctors and criticized Dr. Schmidt's approach.

Judge Wolf then again heard from Commissioner Dennehy. She accepted that Kosilek had a serious medical need but said she had previously been confused about whether surgery was medically necessary. While she had now "deduced" UMass's opinion on the appropriateness of surgery for Kosilek, she had not changed her thoughts on the security and safety concerns related to providing such surgery. Absent these concerns, Dennehy agreed she would have no reason to interfere with any medical order for treatment.

The court questioned Dennehy about her awareness of any publicity surrounding Kosilek's case. Dennehy was generally aware of a couple of articles appearing in the Boston papers and admitted skimming one. She also knew about an article on a national news media website. In general she tried not to read newspaper articles that involved her and she never thought about what the public and political reaction would be if the DOC allowed Kosilek to have surgery.

### 4. The Court-Appointed Expert

After hearing all the witnesses each side wished to present, Judge Wolf decided to appoint an expert in order to help him decide whether the care proposed by Dr. Schmidt was objectively adequate. See Fed. R. Evid. 706 (providing that the court may on its own initiative appoint an expert). After soliciting the

-43-

parties' thoughts on who to appoint, Judge Wolf selected Stephen Levine, M.D., on October 31, 2006. Dr. Levine practiced at the Center for Marital and Sexual Health in Ohio and was a clinical professor of psychiatry at Case Western Reserve University School of Medicine. The court informed Dr. Levine that Kosilek had been living as a woman in prison and instructed him to treat this case as if Kosilek were just another patient out in free society, without all the issues attendant to her being incarcerated.

A month later, Dr. Levine, who did not interview Kosilek, issued a written report. Commenting on the views held by Drs. Brown and Schmidt, he noted they "reflect the current polarities within psychiatry" with each of their respective positions having merit. He wrote that "Dr. Schmidt's view, however unpopular and uncompassionate in the eyes of some experts in GID, is within prudent professional community standards."

In addition to submitting his report, Dr. Levine also testified on December 19, 2006. At first, he reiterated that the treatment recommended by Dr. Schmidt, though perhaps not popular, was within prudent professional standards. He thought Kosilek had obtained a good amount of relief from being on hormones and dressing as a woman and was probably as feminine as she was going to be; surgery would be "icing on the cake" he said. Dr. Levine, like Dr. Schmidt, stopped short of saying that Kosilek would try to kill herself if she was denied surgery. He thought it was just a

possibility and Kosilek's impulse could perhaps change over time. And, he added, even if Kosilek received the surgery, it was possible that, having nothing left to fight for, she could still experience an emotional crisis and contemplate suicide. In general, Dr. Levine had criticisms of both Dr. Schmidt's and Dr. Brown's reports, but he thought they were both reasonable.

During questioning by Judge Wolf, it seemed Dr. Levine had not followed some of the court's directives about not taking into account the fact that Kosilek was in prison. Presuming Kosilek would never be free, Dr. Levine did agree Kosilek had lived a real-life experience as a woman in prison. He also believed she essentially met all the eligibility and readiness requirements for surgery under the Standards of Care. Dr. Levine opined that providing Kosilek with surgery, assuming she had met the real-life experience requirement, would be consistent with prudent professional practice. And although Dr. Levine had earlier in his testimony found Dr. Schmidt's approach to be prudent, he clarified that putting aside issues such as cost and security, it would not be within prudent professional standards to deny Kosilek surgery.

After hearing Dr. Levine's testimony, the court asked the UMass doctors to prepare a written letter indicating what treatment the DOC would propose as a possible alternative to surgery. In a letter filed with the court on February 22, 2007, Dr. Brewer indicated that, after consulting with Drs. Kapila and Kaufman, he

felt that, if denied surgery, Kosilek should receive psychotherapy and should continue to receive hormones and feminine clothes and items. However, Dr. Brewer hastened to add what Drs. Kapila and Kaufman had repeatedly advised him: such treatment was "likely going to be ineffective to relieve Ms. Kosilek's distress and may well result in self harm or suicide."

### 5. Third Round of Testimony

Trial picked back up on March 15, 2007, with Kosilek again calling Dr. Kaufman, as well as an additional witness, Dr. Marshall Forstein of Harvard Medical School and the Cambridge Health Alliance.

Dr. Forstein, who had evaluated Kosilek on behalf of the DOC around the time of Kosilek I (and testified in that trial), evaluated Kosilek again in 2005. Kosilek called on Dr. Forstein to address whether surgery was appropriate and if psychotherapy would be a reasonable alternative to surgery. Sex reassignment surgery, Dr. Forstein opined, was the only reasonable treatment for Kosilek for preventing the potential for self-mutilation or death. He thought surgery was probably not appropriate for actively suicidal patients, but he did not find Kosilek to be so. Nor did Dr. Forstein think psychotherapy or antidepressants were reasonable alternatives to surgery for Kosilek.

Dr. Kaufman again made her views clear during her testimony: "We don't recommend psychotherapy. We recommend

surgery."  Psychotherapy, she said, does not relieve gender identity disorder, especially when it is severe: "rather than trying to change the mind, we find that we need to change the body."  After this testimony, both parties rested.

### 6. Commissioner Clarke Enters the Fray

On May 2, 2007, Dennehy informed the court she was no longer commissioner of the DOC and James Bender had taken her place.  Bender's tenure was short and he never testified.  His successor, Harold Clarke, became commissioner in November 2007.

In April 2008, the court ordered Clarke to review certain trial transcripts, to submit a report of his conclusions, and to offer testimony at a hearing to be held the following month. Clarke submitted his report to the court on May 7, 2008.[20]  In it, he took the same stance as Dennehy had before him. "Insurmountable" is how Clarke characterized his concerns attendant to providing Kosilek with sex reassignment surgery.  Ticking off several of those concerns, Clarke claimed that transporting Kosilek out of the state for surgery would pose a flight risk based on Kosilek's life sentence and her exodus from the state after killing her wife.[21]  Next, he claimed there were flight risks with housing

---

[20]  In connection with preparing the report, Clarke read the testimony of Kosilek, Dennehy, Spencer, and Bissonnette.  He had also reviewed several trial exhibits including the Fenway Report and Dr. Seil's report.

[21]  Like Bissonnette, Clarke considered Kosilek's earlier flight, even though the DOC classification manual says pre-

-47-

Kosilek post-surgery at MCI-Framingham, as it was not as secure as MCI-Norfolk, and Kosilek would pose a risk to the female inmates and vice versa. Clarke opined that the only viable post-operative option would be to place Kosilek in the Special Management Unit at MCI-Norfolk where she would be on lock down twenty-three hours a day.

Clarke's written report highlighted other problems he envisioned. An out-of-state transfer was not a viable option because there was no guarantee another state would take Kosilek or, if it did, that the state would keep her. Nor did Clarke think a special unit for inmates with gender identity disorder would work as such inmates vary greatly in their security and treatment needs. Further, providing Kosilek with surgery in response to her threats of suicide would be "contrary to well-established correctional practices." Inmates should not "be permitted to manipulate the system utilizing a 'do it or else' theory." All of these conclusions, Clarke explained, were based on his own correctional experience, and he expressly disclaimed reliance on any political, media, or cost-related influences.

A few days after submitting his report, on May 12 and 13, 2008, Clarke came before Judge Wolf. He reiterated the security concerns outlined in his report, but was forced to make a few concessions on cross-examination. Clarke did not know that Kosilek

---

custodial flight should not be considered when classifying inmates.

was, at that time, fifty-eight years old; he had assumed she was much younger. Prisoners in their fifties, he agreed, generally cease to be aggressive and have a calming effect in the prison environment. Clarke, who did not consult with any of the prison superintendents in connection with his review, had also never read Kosilek's recent classification report and was not aware of her excellent disciplinary record. Yes, he was aware Kosilek had been transported to scores of doctor's appointments without any attempt at escape and he agreed that if need be the DOC could, "with some degree of certainty," safely transport Kosilek for surgery out of state. Clarke also acknowledged that his previous employer, the State of Washington Department of Corrections (he had been the secretary of this DOC), had housed without any issues a post-operative female transgender inmate, who was serving a life sentence for murdering his sister, in one of its women's prisons.

Clarke was also asked about some letters he had recently received from Massachusetts lawmakers. In particular, a few days after he was ordered by the court to testify, Clarke received a letter signed by seventeen Massachusetts state senators voicing their concerns over Clarke's review of Kosilek's case. The senators "urge[d]" Clarke to deny Kosilek's request for surgery as it would be an "affront to the taxpayers" and "raise a significant security risk." A decision in favor of Kosilek would "send the wrong message to the citizens of Massachusetts." Around that same

time Clarke received another letter signed by twenty-five state representatives. Similar sentiments were expressed in that letter. The representatives vented their "outrage" at Kosilek's request, citing state budget concerns, and contended providing the surgery would "set a bad precedent." At trial, Clarke said he did not respond to the letters as he thought it would be inappropriate given the review he was tasked with. Nonetheless, Clarke was aware the lawmakers were drafting legislation seeking to limit the state's ability to expend funds in this case. He was not however (he said) influenced by the legislators' ire or any of the media's anti-Kosilek coverage.

### 7. The Trial Comes to an End

After Clarke completed his testimony, the parties made closing statements. Then, two years after it had begun, Kosilek's trial came to an end. No more testimony was taken by the court after May 2008. In total the court had sat for twenty-eight days of trial. However time rolled on, and in 2009 and again in 2011 Judge Wolf heard additional arguments from the parties to address recent judicial decisions and developments.

### G. The Kosilek II Decision

On September 4, 2012, after confirming with the parties they had nothing new to report, Judge Wolf issued his decision. See Kosilek II, 889 F. Supp. 2d at 190. The decision was lengthy (126 pages); it contained a thorough history of Kosilek's quest, a

detailed summary of the evidence adduced at trial, and loads of factual findings. In order to prevail on her claim, Judge Wolf found Kosilek had to prove five things: the first two considerations as part of the Eighth Amendment's objective component, the last three as part of its subjective prong. Kosilek had to establish that: (1) she has a serious medical need; (2) the need can only be adequately treated with sex reassignment surgery; (3) the DOC knows that Kosilek is at a high risk for serious harm if surgery is not performed; (4) the DOC did not deny Kosilek the surgery based on a legitimate penological purpose, namely good faith, reasonable security concerns; and (5) the DOC's unconstitutional conduct will continue in the future. The decision addressed each piece in turn.

First, with respect to the serious medical need component, the court found that credible evidence at trial established that Kosilek suffered from severe gender identity disorder and would suffer serious harm if it was not adequately treated. The court focused on Kosilek's threat of suicide (determined to be credible and not manufactured) and the fact that multiple highly qualified doctors employed by the DOC had diagnosed Kosilek with a severe form of gender identity disorder, a diagnosis confirmed by Drs. Brown and Forstein. The court's takeaway: Kosilek had established a serious medical need.

On point two — what treatment was adequate to address this need — the court found the following. The Standards of Care dictated a three-part sequence that called for hormone therapy, a real-life experience living as the opposite sex, and then sex reassignment surgery (though not all patients need or want all these things). Kosilek of course had been on hormone therapy and the court concluded the evidence showed that she underwent a real-life experience living as a woman in prison. The court found Drs. Brown, Kaufman, and Forstein credible when they testified, consistent with the Standards of Care, that surgery was medically necessary for some individuals with severe gender identity disorder and, indeed, medically necessary for Kosilek herself. It also concluded, relying in part on the opinions of Drs. Appelbaum and Levine, that Dr. Schmidt's proposed alternative treatment of psychotherapy, antidepressants, and suicide watch did not meet prudent professional standards. More specifically, the court determined that Dr. Schmidt's categorical views about sex reassignment surgery, including his refusal to recommend sex reassignment surgery for patients, were not supported by the Standards of Care. Moreover, the treatment advocated by Dr. Schmidt would not treat the cause of Kosilek's mental anguish (it would diminish the symptoms at most) or reduce her suffering to the point that she no longer had a serious medical need. Having determined that Kosilek had proven she had a serious medical need

that had not been treated adequately, the court decided that Kosilek had satisfied the objective prong of the Eighth Amendment test. The court then turned its attention to the so-called subjective prong: in essence, did the DOC know of and disregard an excessive risk to Kosilek's health.

The court started with the third issue it had outlined — whether the DOC knew that Kosilek was at risk for serious harm if surgery was not performed. As a threshold matter, the court considered who within the DOC should be its focus as far as who knew what and when. The court determined, based in part on stipulations from the parties, that former DOC Commissioner Dennehy was the sole decision-maker on the issue of whether security concerns should preclude Kosilek from getting surgery. And Dr. Appelbaum of UMass, it decided, should be the focus of the court's determination about whether the DOC was aware that Kosilek had a serious need for surgery. Ultimately though, the court decided this was a distinction without a difference because the evidence established that both Dennehy and Dr. Appelbaum were aware of facts from which they could infer — and did in fact draw the inference — that "a substantial risk of serious harm to Kosilek existed." The court focused on Dr. Appelbaum's numerous communications with Dennehy in which he advised her of the serious risks faced by Kosilek if the Fenway Center's proposed course of treatment was not undertaken. It also looked to the fact that Dennehy had read the

Kosilek I decision, read testimony in this case, and that, in her own testimony, she ultimately did not dispute that Kosilek had a serious medical need.

The court's analysis proceeded to the fourth factor — that is, whether the DOC denied Kosilek surgery based on a legitimate penological purpose. First, the court explained it is not legally permissible to deny a prisoner medical treatment based on cost alone, but the court did not find cost to be the basis for the DOC's decision here. Noting the DOC's provision of various expensive medical treatments to many prisoners, the court specifically declined to find that the DOC's denial of surgery to Kosilek was motivated by the high cost of the treatment. The court then moved on to the main bone of contention, which was whether the DOC's proffered security concerns were its real reason for denying Kosilek surgery. If the DOC's decision was made in good faith and based on reasonable security concerns, the court said it would defer to the DOC's decision. However, such deference was not to be. Quite the contrary, the court found that, after a long period of pretense and prevarication, Dennehy persisted in falsely asserting that providing Kosilek with the surgery would present insurmountable security concerns. The court found Dennehy's security excuses nothing more than a pretext to deny Kosilek surgery. Indeed, it was a "fear of controversy, criticism, ridicule, and scorn" that was the real driving force behind the

DOC's decision to withhold surgery.  In support of its conclusion, the court cited Dennehy's pattern of delay, deviation from DOC policy, feigned ignorance about what treatment DOC doctors were recommending, failure to do a thorough security evaluation before making up her mind, the unrealistic nature of the supposed security risks, and the public and political outcry against Kosilek.  It summed things up this way: "Because there is no penological justification for denying Kosilek the treatment prescribed for [her], [s]he is now being subject to the 'unnecessary and wanton infliction of pain' prohibited by the Eighth Amendment."

Expressing a reticence to tell the DOC how to discharge its duty, and lamenting the fact that the DOC had not just made the proper medical decisions on its own, the court moved on to the final consideration, which was whether the DOC's unconstitutional conduct, absent court intervention, would continue.  Based on the DOC's pattern of unconstitutional conduct as chronicled above, the court determined the DOC's deliberate indifference would not cease without judicial intervention.  Kosilek was entitled to an injunction.  Because an injunction must be narrowly tailored, the court declined to decide who should do the surgery, where it should be done, or where Kosilek should be housed afterwards.  Rather Judge Wolf simply ordered the DOC to provide Kosilek with sex reassignment surgery.  The order read: "Defendant shall take

forthwith all of the actions reasonably necessary to provide Kosilek sex reassignment surgery as promptly as possible."

The DOC quickly filed this appeal and moved the district court to stay its order to provide Kosilek with surgery pending resolution of the appeal, which the court did.

## II. THE ISSUES ON APPEAL

After setting forth the extensive backdrop of Kosilek's odyssey, we start by narrowing the issues before us. On appeal, the DOC attacks the district court's decision but limits its offensive to just a couple of issues. To start, it does not take umbrage with many of the district court's findings, namely that Kosilek has a serious medical need, that the DOC knows she has a serious medical need, that surgery could appropriately treat this need, or that injunctive relief (should the DOC's conduct be deemed unlawful) is an appropriate vehicle for relief. And based on the evidence adduced at trial, we think the DOC would not have had strong arguments on any of these points.

The two basic criticisms the DOC levels at the district court's decision are the following. First, it claims the court erred in finding that the DOC's decision not to provide Kosilek sex reassignment surgery constitutes inadequate medical care in violation of the Eighth Amendment. Second, it contends the court erred in finding the DOC deliberately indifferent to Kosilek's need for treatment. We elaborate.

-56-

On point one, the DOC argues that surgery is not constitutionally required because the treatment Kosilek is already receiving — psychotherapy, hormones, permanent hair removal, and access to female clothing and cosmetics — is adequate. Kosilek, it contends, is not entitled to the most sophisticated or desirable treatment or to curative treatment, as opposed to treatment for her mental illness. And should Kosilek engage in self-injurious behavior (e.g., attempt to commit suicide) if denied surgery, the DOC contends treating this behavior with methods like psychotherapy, antidepressants, and a protective environment would be adequate. In sum, the DOC thinks the court erred when it found the DOC's current and proposed treatment course inadequate (i.e., failed to meet prudent professional standards) under the Eighth Amendment and the sex reassignment surgery medically necessary.

Kosilek disagrees. She counters that the court correctly found surgery to be the only adequate treatment for her serious medical need — a finding supported by more than ample evidence. Kosilek points out that almost all of the medical professionals who testified at trial agreed this was the case, and only the DOC's experts disagreed; Kosilek says the court was entitled to disbelieve them. She claims the evidence also establishes that, even with hormones and psychotherapy, her mental anguish is severe and the DOC's proposed course of treatment would not sufficiently

reduce this.  Sex reassignment surgery is medically necessary, according to Kosilek.

As to the court's deliberate indifference finding, the DOC contends the court erred in rejecting the safety and security concerns presented by DOC officials at trial in support of their decision to withhold surgery, which they say were based on their best correctional judgment and were reasonable and not pretextual. The DOC "vigorously disputes" that the public criticism of Kosilek and her request for surgery had any impact on the decision-making process of Commissioner Dennehy or her successor, Clarke.  However, other than this broad assertion it says little else about Dennehy herself and her motives.  Instead it homes in on Dennehy's ultimate successor Clarke, claiming that he should be the focus of this court's determination as to the validity of the security concerns voiced by the DOC (despite the DOC's at-trial stipulation that Dennehy was the operative decision-maker).[22]  There was an absence of evidence in the record, says the DOC, that Clarke's proffered security concerns were exaggerated or made in bad faith and so, the court was required to accord him deference.  Further, the DOC points out Kosilek offered no counter correctional expert testimony, and the district court did not find that Superintendent

_____

[22] At oral argument counsel for the DOC clarified that he does not suggest that this court disregard Dennehy's testimony, only that it should focus on Clarke's as it is more relevant being closer in time.

Bissonnette or Spencer acted in bad faith or were tainted by a fear of public criticism.

On the court's deliberate indifference finding, Kosilek argues that the DOC had no legitimate security reason to withhold surgery and importantly, more than sufficient evidence supported the court's conclusion that the alleged security concerns were pretextual. Kosilek points to several pieces of evidence: the security decision was made before any security review occurred; a subsequent security review did not follow DOC procedure; the security report was hastily drafted by trial counsel; and the security evaluation that was performed did not take into account certain fundamental factors like Kosilek's age and good disciplinary record. Kosilek adds that there was evidence that Kosilek's transportation to surgery and post-operative placement would not be actually impossible from a security perspective. As such, no "mechanical deference" is owed to the DOC, according to Kosilek, whose argument focuses on the illegitimacy of the proffered security concerns rather than the supposed role public criticism played in the DOC's decision. Kosilek also lambasts the DOC for attempting to distance itself from Dennehy on appeal since below the DOC stipulated that Dennehy's motivations should be the focus and in fact objected to Clarke's testimony as unnecessary.

With the arguments delineated and the issues narrowed, we turn to the operative law.

## III. EIGHTH AMENDMENT CRITERION

The Eighth Amendment provides the vehicle through which courts scrutinize "the treatment a prisoner receives in prison and the conditions under which he is confined." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (internal quotation marks omitted). One way prison officials violate the Eighth Amendment is when they fail to provide an inmate with adequate medical care, such that "their 'acts or omissions [are] sufficiently harmful to evidence deliberate indifference to serious medical needs.'" Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)). To prevail on an Eighth Amendment inadequate medical care claim, a plaintiff must satisfy two inquiries, one objective and one subjective. Id.

The objective component requires that "the deprivation alleged must be, objectively, sufficiently serious." Farmer, 511 U.S. at 834 (internal quotation marks omitted); Leavitt, 645 F.3d at 497. Thus an Eighth Amendment claim such as this one turns, in part, on whether the prisoner has a "serious medical need," in other words, "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Mahan v. Plymouth Cnty. House of Corr., 64 F.3d 14, 18-19 (1st Cir. 1995) (internal quotation marks omitted). A prisoner is entitled to adequate medical care for that need, though

this does not necessarily mean the most sophisticated care available.  United States v. DeCologero, 821 F.2d 39, 42 (1st Cir. 1987).  Rather, adequate care is "services at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards."  Id. at 43.

For the subjective prong to be satisfied, prison officials must have had "a sufficiently culpable state of mind"; that is, they showed deliberate indifference to an inmate's health and safety.  Farmer, 511 U.S. at 834; Leavitt, 645 F.3d at 497. "Deliberate indifference means that a prison official subjectively must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Ruiz-Rosa v. Rullán, 485 F.3d 150, 156 (1st Cir. 2007) (internal quotation marks omitted).  To establish a subjective intent, "a deliberate intent to harm is not required," rather "it is enough for the prisoner to show a wanton disregard sufficiently evidenced 'by denial, delay, or interference with prescribed health care.'"  Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011) (quoting DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991)).

If a court finds that the Eighth Amendment's objective and subjective prongs have been satisfied, it may grant appropriate injunctive relief.  Farmer, 511 U.S. at 846.

-61-

## IV. STANDARD OF REVIEW

Here Kosilek's Eighth Amendment claim was heard exclusively by a judge. When this court decides an appeal from a judgment following a bench trial, different standards of review are at play. Wojciechowicz v. United States, 582 F.3d 57, 66 (1st Cir. 2009).

First, questions of law engender de novo review. Id. Findings of fact, however, are reviewed only for clear error. Id. This means we accept the court's factual findings unless the evidence compels us to conclude contrarily that a mistake was made, "keeping in mind that the district judge had the opportunity to assess the credibility of the witnesses." Janeiro v. Urological Surgery Prof'l Ass'n, 457 F.3d 130, 138 (1st Cir. 2006). "'This deferential standard extends . . . to inferences drawn from the underlying facts,' and 'if the trial court's reading of the record [with respect to an actor's motivation] is plausible, appellate review is at an end.'" Id. at 138-39 (alteration in original) (quoting Smith v. F.W. Morse & Co., 76 F.3d 413, 420 (1st Cir. 1996)). Finally, with mixed questions of law and fact, there is a continuum. Johnson v. Watts Regulator Co., 63 F.3d 1129, 1132 (1st Cir. 1995). The more fact-intensive the question, the more deferential our review. Id. Conversely, the more law-dominated the question, the more likely our review moves toward a de novo look. Id.

Before going any further we address a point of dispute among the parties.  While everyone agrees that the above standard of review controls, the parties disagree on how to apply it.[23] Kosilek argues that the district court's determinations on the adequacy of the medical care and the viability of the purported security rationale are findings of fact and therefore this court's review is for clear error only.  The DOC, however, claims that the court's conclusion regarding the appropriateness of Kosilek's health care is a conclusion of law engendering de novo review; it does not address at all what standard should apply to the court's deliberate indifference finding.  Neither side gives us any legal support for the respective positions they take in this debate.

This court has not provided clear guidance; however, we are not left totally in the dark.  For one, we have explained that a "state-of-mind issue such as the existence of deliberate indifference usually presents a jury question," Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991), in other words an issue for the finder of fact.[24]  Further, when reviewing a trial judge's

---

[23] In violation of our rules, the DOC did not include a standard of review in its opening brief.  See Fed. R. App. P. 28(a)(9)(B).  Not until its reply brief did we learn the DOC's stance on this important issue.

[24] The Eighth Circuit has held that "whether an official was deliberately indifferent to [an] inmate's serious medical need" is a question of fact.  Schaub v. VonWald, 638 F.3d 905, 915 (8th Cir. 2011).  On the other hand, the Fifth Circuit has characterized it as a legal conclusion resting on certain facts.  Walker v. Butler, 967 F.2d 176, 178 (5th Cir. 1992).

determination on the adequacy of medical treatment following a bench trial, this court has applied the deferential clearly erroneous standard. DesRosiers, 949 F.2d at 19-20.[25] And it is well established that "elusive issues of motive and intent" (at play here in connection with the subjective prong) are typically fact-bound ones subject to the clearly erroneous rule. Fed. Refinance Co. v. Klock, 352 F.3d 16, 27-28 (1st Cir. 2003); see also McIntyre ex rel. Estate of McIntyre v. United States, 545 F.3d 27, 40 (1st Cir. 2008).

On top of all this, the district court here "engaged in a careful and close analysis of the trial evidence" and therefore, given the fact-intensive nature of the court's inquiry, we are satisfied that the court's findings — that the DOC refused to provide medically necessary treatment for a serious, life-threatening medical condition that could be accommodated without security risk — should be reviewed for clear error only. See, e.g., Turner v. United States, 699 F.3d 578, 584 (1st Cir. 2012). To the extent that any of the court's findings could be viewed as more akin to a mixed question of law and fact or even a legal label (the most arguable one being whether the DOC's conduct amounted to deliberate indifference), some deference is still appropriate. See

---

[25] The Ninth Circuit seems to take a similar approach. It described a dispute about whether "any option other than surgery was medically acceptable" for an inmate alleging an Eighth Amendment violation as an "issue of fact." Snow v. McDaniel, 681 F.3d 978, 988 (9th Cir. 2012).

<u>Battista</u>, 645 F.3d at 454 ("The legal labels applied to facts are reviewed on appeal more closely than a district court fact-finding, but often with some deference to the district judge."); <u>Fed. Refinance Co.</u>, 352 F.3d at 27 (explaining that the more fact-intensive the question the more deferential our review).[26]

The dissent first diverges from this opinion on the standard of review issue. While our dissenting colleague agrees that a continuum (anchored on one side by de novo review and on the other by clear error review) is at play, he is not convinced that the district court's controlling findings should be reviewed on the clear error end of the spectrum. However, the dissent does not explain how any of the findings made by the district court, which

---

[26] Our precedent indicates that where a district court's decision threatens to intrude on a party's First Amendment rights, we must "make an independent examination of the whole record" in reviewing a decision that there is no such intrusion. <u>Bose Corp.</u> v. <u>Consumers Union of U.S., Inc.</u>, 466 U.S. 485, 499 (1984) (quoting <u>New York Times Co.</u> v. <u>Sullivan</u>, 376 U.S. 254, 285 (1964)). But we are aware of no precedent for importing this elevated review into other contexts not implicating a need to guard against judicial restriction of First Amendment rights. Supreme Court decisions certainly signal no license to extend <u>Bose Corp.</u> beyond First Amendment cases. <u>See</u> <u>Maine</u> v. <u>Taylor</u>, 477 U.S. 131, 145 (1986) ("[N]o broader review is authorized [under <u>Bose Corp.</u>] simply because this is a constitutional case."); <u>Hernandez</u> v. <u>New York</u>, 500 U.S. 352, 367-69 (1991) (refusing to apply elevated review under <u>Bose Corp.</u> and instead applying clear error review to a claim under the Equal Protection Clause); <u>Thornburg</u> v. <u>Gingles</u>, 478 U.S. 30, 78-79 (1986) (doing the same in a claim of vote dilution under the Voting Rights Act). And as our dissenting colleague perceptively explained in another opinion, it is not clear that a heightened standard would apply even if this were a First Amendment case, because the district court did not reject but sustained the assertion of a constitutional right. <u>United States</u> v. <u>Frabizio</u>, 459 F.3d 80, 96 (1st Cir. 2006) (Torruella, J., concurring).

led to the result we are affirming, are anything more than quintessentially factual findings.  And while the dissent argues that we must review de novo the district court's conclusion that the facts demonstrate an Eighth Amendment violation, where a legal conclusion flows directly from factual findings, our review of those factual findings — and thus the overall conclusion — remains deferential.  For example, in a recent Eighth Amendment case similar to this one, we reviewed the district court's determination that the state had been deliberately indifferent to the needs of a prisoner suffering from gender identity disorder by asking whether the court had a "reasonable basis" for its conclusion, not whether the district court actually reached the right decision.  Battista, 645 F.3d at 454-55.  Here, the success of Kosilek's claim depends almost entirely on questions of credibility (in assessing the state's motives) and on questions of medical care (in assessing Kosilek's medical needs).  These are exactly the kinds of questions that we must review deferentially, especially where, as here, there is ample testimony precisely and directly supporting the district court's answers to such questions.

        With the parameters of our review cleared up, we move on to the merits of this case.

### V. THE OBJECTIVE PRONG

        As we said, the DOC does not dispute that Kosilek has a serious medical need.  The real issue is whether the district court

-66-

erred in finding that the care the DOC has provided Kosilek with (i.e., hormones, psychotherapy, and feminine items) and proposes to provide her with to relieve any self-injurious behavior (i.e., psychotherapy, antidepressants, and a protective environment) is adequate. Said another way, is, as the district court found, sex reassignment surgery medically necessary and the only appropriate treatment for Kosilek?

Our review starts off with the DOC's expert Dr. Schmidt, who the district court concluded was not a prudent professional.[27] This finding was not clearly erroneous. First, Dr. Schmidt expressed a good deal of disagreement with the Standards of Care.[28] However, the Standards of Care were widely relied upon and trusted by the other medical providers who testified at trial and have been cited by the courts as generally accepted. See, e.g., De'Lonta v. Johnson, 708 F.3d 520, 522-23 (4th Cir. 2013) (describing the

---

[27] In its decision, the court noted it had considered Osborne's testimony but was not discussing it separately because she testified consistent with her colleague Dr. Schmidt and there was a question as to whether she should even be considered in the prudent professional debate because she is a social worker and not a medical doctor. We take the same tack and focus on Dr. Schmidt.

[28] The Seventh Version of the Standards of Care, which, as indicated, came out in 2011, contains a new section addressing the applicability of the standards to persons living in institutional environments such as prison or long-term care facilities. Standards of Care, Version 7, at 67. It indicates that, for those persons, health care "should mirror that which would be available to them if they were living in a non-institutional setting" and that "[a]ll elements of assessment and treatment as described in the [Standards of Care] can be provided to people living in institutions." Id.

Standards of Care as "the generally accepted protocols for the treatment of GID"); Soneeya v. Spencer, 851 F. Supp. 2d 228, 231 (D. Mass. 2012) (noting that the "course of treatment for Gender Identity Disorder generally followed in the community is governed by the 'Standards of Care'"); O'Donnabhain v. Comm'r of Internal Revenue, 134 T.C. 34, 65 (U.S. Tax Ct. 2010) (indicating that the Standards are "widely accepted in the psychiatric profession, as evidenced by the recognition of the standards' triadic therapy sequence as the appropriate treatment for GID and transsexualism in numerous psychiatric and medical reference texts").

More specifically, the Standards of Care, which the parties agree are applicable in some regard to the treatment of gender identity disorder (though the DOC would certainly like to see them given less weight than Kosilek would), provide for a triadic approach: a real-life experience in the preferred gender role, hormones of the desired gender, and surgery to alter one's genitalia. The Standards of Care indicate that for persons with severe gender identity disorder, sex reassignment surgery is effective. Standards of Care at 18. In such persons, surgery paired with hormone therapy and a real-life experience is "medically indicated and medically necessary." Id. Surgery is not, the Standards of Care say, "experimental, investigational, elective, cosmetic, or optional in any meaningful sense." Id. Dr. Schmidt, however, disagreed with the proposition that surgery is

medically necessary in cases of severe gender identity disorder. In fact, he did not recall seeing a case of gender identity disorder serious enough to require surgery in the approximately 300 patients he has evaluated. Dr. Schmidt's views regarding the need for surgery for patients with severe gender identity disorder was not only unsupported by the Standards of Care but also contradicted by the testimony of the other medical providers at trial.

As for what treatment was appropriate for Kosilek in particular, Dr. Schmidt opined that surgery was not necessary as Kosilek had done well just using hormones thus far. The main barrier Dr. Schmidt saw was that, in his opinion, a real-life experience living as the opposite gender could not be effectively replicated in prison. Rather, Dr. Schmidt's proposed course of treatment was to utilize psychotherapy and medication to reduce Kosilek's dysphoria to a point where she was no longer at risk for serious harm. Should her suicidal desires persist, Dr. Schmidt thought Kosilek could be effectively managed in a medical facility. However, a majority of the other medical providers who testified at trial regarding Dr. Schmidt's proposed course of treatment thought it was unreasonable (namely, Drs. Kapila, Kaufman, Appelbaum, and Forstein).[29] The consensus was that Dr. Schmidt's approach would

---

[29] We do not list Dr. Levine among these providers because, as the reader will recall, there was some change in his testimony. Initially he opined that Dr. Schmidt's view, though unpopular, was reasonable. However, Dr. Levine apparently had disregarded the court's order to treat Kosilek as if she were a patient out in free

-69-

not effectively treat the real issue, which was Kosilek's gender identity disorder, or significantly relieve her distress to a level where she was not at risk for serious harm. As Dr. Kapila explained, Kosilek's symptoms and distress had not been resolved though she had been on hormones for some time.

Ultimately, the court was confronted with two diametrically opposed opinions, both given by qualified medical professionals. Given the contradictory evidence, which was heavily weighted against the DOC, we are far from left with the impression that the trial court made a mistake when it determined that Dr. Schmidt was not a prudent professional or that his approach was unreasonable. See Janeiro, 457 F.3d at 138. The court did not clearly err.

The question that remains is what treatment is medically adequate to treat Kosilek. The DOC twists the district court's holding, claiming that it impermissibly held that the Eighth Amendment requires treatment that actually "cures" the inmate's condition. The court said no such thing. It simply found that the only adequate treatment in this case was sex reassignment surgery.

_____

society. After being reminded of those parameters, Dr. Levine clarified his opinion. He said, putting aside a variety of concerns about the surgery, including cost, security, and the requirement of a "real life experience," prudent professionals do not ordinarily prevent a patient from receiving sex reassignment surgery. But even were we to disregard Dr. Levine's opinion entirely, there was ample evidentiary support for the court's conclusion that Dr. Schmidt's approach was not prudent.

And though, according to the experts, surgery did have the potential to cure or at least greatly alleviate Kosilek's gender identity disorder, this does not translate to a finding by the court that only curative treatment passes constitutional muster. To give an example, if Kosilek had cancer and the court found chemotherapy to be the only adequate treatment under the Eighth Amendment, as opposed to, say, an aspirin, it would not necessarily follow that the court held that the Eighth Amendment requires an inmate to be cured. The DOC's argument misses the mark.

However, as the district court found, there is a difference between treating the underlying disorder and treating only its symptoms. The Seventh Circuit Court of Appeals drew a similar distinction when it held that a Wisconsin statute which prohibited the state's department of corrections from providing transgender inmates with hormones and sex reassignment surgery was unconstitutional. Fields v. Smith, 653 F.3d 550, 552-53, 559 (7th Cir. 2011). The court, discussing how some patients require hormone therapy, noted that although the defendant department could "provide psychotherapy as well as antipsychotics and antidepressants, defendants failed to present evidence rebutting the testimony that these treatments do nothing to treat the underlying disorder." Id. at 556. The defendants failed to show, the court concluded, that another treatment could be an adequate stand-in for hormone therapy. Id.

And providing some treatment is not the same as providing adequate treatment. The Fourth Circuit Court of Appeals, in De'Lonta, 708 F.3d at 520, reversed the district court's dismissal of a transgender inmate's Eighth Amendment claim. The court found that the inmate, who sought sex reassignment surgery because her gender identity disorder symptoms persisted despite receiving hormones, stated a plausible deliberate indifference claim. Id. at 522, 525. Notably the court found that just because the Virginia Department of Corrections had provided the inmate with some treatment for her gender identity disorder (hormone therapy and psychological counseling) consistent with the Standards of Care, "it does not follow that they have necessarily provided her with constitutionally adequate treatment." Id. at 522, 526. The court added that total deprivation of care is not a prerequisite for a constitutional violation. Id. at 526.

Here there was testimony from the medical providers at trial that the preferred approach is to treat the underlying problem (the gender identity disorder) and not just the symptoms, as Dr. Schmidt proposed. "[Y]ou treat the primary problem, you don't treat symptoms," Dr. Kapila testified. And while the evidence, as recognized by the district court, was that Kosilek had shown improvement being on hormones and had obtained some measure of stability holding on to the hope of receiving surgery, all the medical providers, save Dr. Schmidt, agreed that this was not

-72-

enough.  As the Fenway Center doctors concluded early on, all signs indicated that Kosilek was still quite distressed and likely to suffer serious harm in the form of suicide if not operated on.

The take-away from the evidence: surgery was the next logical adequate treatment step.  Kosilek had been on hormones for some time and the evidence, in the form of reports and testimony from the Fenway Center doctors and Drs. Forstein and Brown, supported the notion that Kosilek had undergone a real-life experience living as a woman in prison.  In fact, Dr. Brown testified that in his opinion Kosilek had not only met the minimum real-life experience but had exceeded it.  Dr. Brown focused on the amount of information (presumably the significant medical and disciplinary records kept in a prison setting) that existed regarding Kosilek's time in prison.  Dr. Brown would not, he explained, have such a thorough record with a patient in the outside world.  And Dr. Schmidt's opinion that a real-life experience could never be replicated in prison did not take into account Kosilek's situation in particular, or more generally the different realities of transgender prisoners.  As the district court found, "[f]or someone like Kosilek who is serving a sentence of life without the possibility of parole, prison is, and always will be, [her] real life."

With the prerequisites for surgery satisfied, Drs. Brown, Kaufman, Forstein, Kapila, and Appelbaum all testified

unequivocally: sex reassignment surgery was medically necessary and the only appropriate treatment for Kosilek. And they all agreed that a very likely consequence of Kosilek not receiving the surgery was a serious risk of harm, predominantly suicide. Kosilek herself testified, and the court found credibly so, that though hormone treatments had helped, she still suffers intense mental anguish over her male genitalia and believed she needed surgery. As Kosilek explained, she did not want to continue living with her male genitalia and antidepressants and psychotherapy would not change that.

We are bound by certain well-established adages: a party challenging findings of fact after a bench trial "faces a steep uphill climb" and this court "is not at liberty to start afresh." Monahan v. Romney, 625 F.3d 42, 46 (1st Cir. 2010) (internal quotation marks omitted). Here there was ample evidence to support the district court's conclusion that sex reassignment surgery was the only adequate treatment for Kosilek. In fact, substantial evidence, notwithstanding Dr. Schmidt's testimony, pointed in that direction. The court did not clearly err in deciding to credit the evidence and testimony offered by Kosilek and in concluding that the objective component of the Eighth Amendment inquiry had been satisfied. In sum, where at least three eminently qualified doctors testify without objection, in accord with widely accepted, published standards, that Kosilek suffers from a life-threatening

disorder that renders surgery medically necessary, and the factfinder is convinced by that testimony, we are at a loss to see how this court can properly overrule that finding of fact.

## VI. THE SUBJECTIVE PRONG

The basis for the district court's deliberate indifference conclusion was its findings that the DOC had no valid penological reason to deny surgery. As indicated earlier, the judge primarily focused on Dennehy (as the parties stipulated), concluding that she delayed treatment, deviated from policy, inadequately reviewed security ramifications, and manufactured security concerns. The court also assessed Clarke's motivations and concluded that Clarke's failure to do a thorough security review suggested he did not operate with an open mind. Also found to be important on both the Dennehy and Clarke front: the unrealistic nature, in the court's mind, of the supposed security risks and the public and political outcry against Kosilek. The issue for this court to decide is whether the record supported these underlying factual conclusions.

First, let us get a few things out of the way. Though a lot of the public and political opposition to Kosilek receiving surgery involved a rally cry that taxpayers should not have to foot the bill for the procedure, the district court did not think that cost considerations played any role in the DOC's decision to deny surgery. And both the parties agree with this point on appeal;

there was no evidence that the DOC withheld surgery because it was too expensive.  Therefore we have no cause to consider the cost issue.[30]  Second, as alluded to, the parties disagree about whether Dennehy or Clarke or both should bear the brunt of this court's attention on the validity-of-the-security-concerns issue.  In suits like this one, where injunctive relief is sought "to prevent a substantial risk of serious injury from ripening into actual harm," we consider deliberate indifference "'in light of the prison authorities' current attitudes and conduct,' [and] their attitudes and conduct at the time suit is brought and persisting thereafter." Farmer, 511 U.S. at 845 (quoting Helling v. McKinney, 509 U.S. 25, 36 (1993)).  Therefore we will look at both Dennehy and Clarke. With those preliminary points dealt with, we proceed to the merits.

---

[30] Although the DOC has not argued the cost issue, much media commentary focused on the cost of sex reassignment surgery for Kosilek, and a prior commissioner of the DOC claimed that the surgery was an inappropriate use of taxpayer funds.  As the district court noted in Kosilek II, one Boston Globe column from 2000 griped that Kosilek was "demanding that the state, meaning you and me, pay the $25,000 for a sex-change operation."  889 F. Supp. 2d at 215.  While the record does not indicate if that number reflects the exact cost of the surgery today, it appears to be in the ballpark.  Yet, the cost of sex reassignment surgery pales in comparison to the amount of money it seems the state will be expending to defend this lawsuit.  Around a year ago, Kosilek's attorneys filed a motion in the district court seeking to have the DOC pay them over $800,000 in fees and costs.  In a tentative ruling issued from the bench, Judge Wolf indicated that he is planning to order the DOC to pay around $700,000, though it does not appear that this amount has yet been formalized in a written order.

Clearly, when decisions about medical care are made in the prison system, there are certain considerations not present in society at large. "Any professional judgment that decides an issue involving conditions of confinement must embrace security and administration and not merely medical judgments." Battista, 645 F.3d at 455. And because "security considerations . . . matter at prisons" and conflicting demands must be balanced by officials, the deliberate indifference test "leave[s] ample room for professional judgment." Id. at 453, 454.

However, as we explained in Battista, at some point a defendant forfeits the advantage of deference. Id. at 455. In Battista, which involved some of the same players as this case, this court considered the claim of another transgender inmate suing the Massachusetts DOC. Id. at 450. This court found the record supported the district court's determination that the DOC had shown deliberate indifference by refusing to provide the inmate with the hormone treatment that doctors had recommended for her. Id. at 450, 455. As it does in this case, the DOC cited security concerns for denying the recommended treatment. Id. at 452. Nonetheless, in reaching its result, the Battista court refused to give the DOC the advantage of deference. Id. at 455. It cited a "pattern of delays, new objections substituted for old ones, misinformation and other negatives," including an initial failure to take the inmate's diagnosis of gender identity disorder and request for

-77-

hormones seriously, the passage of years before a substantial security justification was made, and the DOC's portrayal of the only options as withholding hormones or placing the inmate in severely constraining protective custody. Id.

Here Judge Wolf found a very similar pattern of behavior on the DOC's part and the record supports this finding. On the delay front, it has indisputably been many years since medical providers started considering the propriety of surgery for Kosilek. Dr. Forstein, back in then Commissioner Maloney's tenure (the years 1997 to 2003) during the days of Kosilek I, had recommended that Kosilek be allowed to consult with a surgeon who specialized in sex reassignment surgery. In 2003, Dr. Seil made the same recommendation, indicating that Kosilek should be allowed to meet with a specialist after a year on hormones. Then in February 2005, the Fenway Center doctors indicated after evaluating Kosilek that she should be allowed to have surgery. Dennehy herself was Deputy Commissioner during Kosilek I and was involved in the decisions made in connection with that case. And right when she started as Commissioner, Dennehy slowed things down. She took the unusual step in assuming an active role in a de novo blanket reassessment of the treatment of those inmates suffering from gender identity disorder, including Kosilek, despite the fact that the DOC's contract with UMass provided that the UMass medical professionals would make the decisions about the medical care for inmates with

this disorder and the Commissioner would only step in at the end to assess any security concerns.

The DOC explains away this delay by claiming that for a long time it did not understand that UMass recommended surgery for Kosilek, but the district court did not buy it. And, in reality, the issue seems to be one of semantics. While there was testimony from Hughes and Martin that they knew UMass supported the Fenway Center doctors' recommendation for surgery, they did not think UMass was clear enough on the logistics or whether surgery was "medically necessary" (as opposed to medically optional). However, Drs. Appelbaum and Brewer made pellucid in their June 14, 2005 letter that they did not think it was within their purview to decide as a legal matter whether surgery for Kosilek was medically necessary. Thus, in the end, there was evidence that the DOC knew that Kosilek's medical providers were recommending surgery, and in response, the DOC dallied and disregarded. This behavior is significant, as in order to establish a subjective intent, "it is enough for the prisoner to show a wanton disregard sufficiently evidenced 'by denial, delay, or interference with prescribed health care.'" Battista, 645 F.3d at 453 (quoting DesRosiers, 949 F.2d at 19); see also Johnson v. Wright, 412 F.3d 398, 404 (2d Cir. 2005) (A "deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians.").

While the DOC maintains that it opposed surgery based on security concerns, the district court did not clearly err in finding that these concerns followed hasty, results-driven evaluations.  Written procedure adopted by the DOC required that, subsequent to a medical provider's recommendation that an inmate receive treatment for gender identity disorder, the Superintendent in the relevant prison would conduct a security assessment and make a recommendation to the Commissioner.  Despite this policy, the DOC concluded, as was reported in the news piece Dennehy was interviewed for, that surgery for Kosilek "would result in a security nightmare" before it ever conducted such a review.

Once the security review was eventually undertaken, the DOC did not give itself much time to complete it.  Although the DOC was ordered by the court back on April 25, 2005 to conduct the review, Dennehy, the attorneys, and the superintendents did not meet until May 19 to produce the report, which was due to the court on May 27.  The report was then penned predominantly by trial counsel and reviewed by Dennehy only a day or two before it went to Judge Wolf.  This pattern of haste continued.  On November 23, 2005, just nine days before expert disclosures were due, Dennehy contacted the director of the Federal Bureau of Prisons looking for a recommendation for a security expert to testify at trial.  When the DOC experts did testify, it was apparent, as the court explained, that both Dumond and Beeler "failed to consider material

aspects of Kosilek's history and personal characteristics in forming their opinions," such as her good disciplinary record or her medical records. As a result, the court gave their testimony "little weight."

As for Clarke's security review, the court criticized him for not consulting with Spencer, then still the Superintendent of MCI-Norfolk, and for apparently not reviewing any of the DOC's expert security testimony offered at trial, when deciding whether he agreed with Dennehy's stance on surgery. The DOC calls this finding disingenuous since the court's order only called for Clarke to review certain testimony and Clarke testified that accordingly this is what he did. It is unclear whether Clarke shirked his review responsibilities or genuinely felt that his review was limited in scope. But both views are permissible and when faced with two permissible views of the evidence, the district judge's choice of one of them cannot be clearly erroneous. See Monahan, 625 F.3d at 46. Plus the thoroughness of Clarke's review is undercut by the fact that he did not know some important pieces of information, such as Kosilek's age and excellent disciplinary record, when he advanced his security concerns.

Another denouement of the district court was that the security concerns the DOC ultimately proffered (following its hasty review) were "largely false" and "greatly exaggerated." This conclusion was not clearly erroneous. The DOC repeatedly protested

that transporting Kosilek to surgery out of state would pose an insurmountable security risk. On its face, the concern seems patently unrealistic. First, the DOC undoubtedly has a large amount of experience transporting prisoners within and outside of Massachusetts. Further, the likelihood of Kosilek, who has been transported to multiple doctor's appointments without issue, fleeing while traveling to receive the surgery that she has dedicated decades of her life to obtaining is improbable enough that we need say nothing more. Almost equally as unlikely is the idea that a now sixty-four year old, post-surgical, recovering Kosilek would be able to escape when being transported back to prison. Even Clarke conceded that it was near certain that the DOC could safely transport Kosilek to and from surgery. On top of all this, there was evidence that the surgery might be able to be performed in Massachusetts. An Illinois doctor testified at deposition that he would be willing to evaluate Kosilek for surgery and travel to Massachusetts to operate on her if all the appropriate arrangements, such as licensing requirements, could be made.

The DOC's argument that Kosilek's post-operative housing would create a security risk is more plausible than its out-of-state-transport one, but not enough for us to think the court clearly erred in not crediting it as a bar to surgery. Ultimately there was evidence of viable housing options for Kosilek.

Though the DOC claims that housing Kosilek in the general population at MCI-Norfolk or MCI-Framingham is not feasible, the evidence did not unequivocally support this proposition. First, Kosilek has been housed safely while living as a woman — wearing female clothing, using female cosmetics, and taking female hormones that caused her to develop breasts and a feminine body shape — in the general population at MCI-Norfolk for many years. Moreover, in connection with Kosilek I, then Commissioner Maloney was adamant that there were serious security concerns surrounding Kosilek remaining at MCI-Norfolk while receiving hormones. He reasoned that many inmates were sex offenders and a prisoner living as a female with female attributes such as breasts would create a risk of violence. But once an actual security review was done, then Superintendent Spencer reported that there were no current security concerns with Kosilek being provided estrogen therapy. And no security issues ended up cropping up after that. The DOC's about-face calls into question their present stance with regard to the impact of surgery.

Second, with regard to housing Kosilek in the general population at MCI-Framingham, there was evidentiary support for the court's conclusion that the DOC's concerns were bogus or at least overblown. For one, the DOC claimed men are stronger than women. But Kosilek's perceived superior strength as a man did not jibe with her advanced age, physically slight frame, or the fact that

-83-

she has been on female hormones for years.  Moreover, the DOC's claim that she would be an escape risk based on the weak perimeter at MCI-Norfolk is also questionable when one considers Kosilek's excellent disciplinary record and the fact that she would, at least initially, be a post-operative patient.  And while the DOC pointed to Kosilek's life sentence as a factor compounding the risk of her escape, Bissonnette testified that MCI-Framingham already housed around forty life offenders and gave no explanation why Kosilek should be viewed differently from these other lifers.  Finally, in rejecting the DOC's heightened flight risk contentions if Kosilek were housed at MCI-Framingham, the court noted that according to the DOC's classification manual, Kosilek's post-crime, one-time pre-arrest flight (a flight embarked on twenty-three years ago) should not even have been a consideration, even though Bissonnette claimed it was.[31]

The potential for Kosilek causing inmate climate issues at MCI-Framingham due to the fact that she murdered her wife was another theory the DOC floated in support of its security concern

---

[31] According to both Spencer and Bissonnette, Kosilek also could be safely housed in their respective high-security units, though of course that would come with trade-offs for Kosilek as far as how restricted her life would be.  Obviously Kosilek is aware of those trade-offs and persists in her request for surgery.

There was also evidence of another scenario — an out-of-state transfer for Kosilek.  The DOC's only counter to this was the speculative ground advanced by Clarke that there was no guarantee another state would take or keep Kosilek.  But there was no evidence that either of these scenarios were explored or probable.

argument. But the possibility of one inmate being offensive to another based on the crime the other inmate committed is not a new phenomenon, and the evidence was that there were procedures in place to deal with these types of situations at MCI-Framingham, such as moving prisoners around. Not to mention, as Clarke recognized, his former employer, the Washington Department of Corrections, housed a post-operative female transgender inmate, also serving a life sentence for murdering a female relation, without security or climate issues.

Aside from the DOC's purported security concerns, the court pointed to other evidence which it thought suggested the DOC's denial of surgery was not prompted by valid penological concerns but rather a deliberate indifference to Kosilek's medical needs. For instance, there was evidence that the DOC did not leave things up to chance when it sought an opinion about whether an operation for Kosilek was even warranted. The DOC knew before it retained Osborne that she was assisting other departments of corrections in defending litigation filed by transgender prisoners. In fact, Hughes specifically noted that Osborne would be more sympathetic to the DOC's concerns and that she did not believe that sex reassignment surgery was appropriate in the corrections setting. It was not a stretch for the court to disbelieve Dennehy's testimony that Osborne's very predictable opposition to

providing Kosilek with surgery did not play a role in her selection.

The public disapproval of Kosilek's quest was another piece of the puzzle. Even though Dennehy and Clarke denied being motivated by avoidance of public controversy, the district court found this testimony lacking in credibility and concluded that Dennehy and Clarke were keenly aware of and in fact motivated by the outcry. Evidence supporting the court's finding included Dennehy's press appearance in the news piece featuring her senator acquaintance who opposed the surgery; Dennehy's testimony that she was aware that some politicians were against Kosilek being provided with surgery and that she was generally aware of the negative news coverage; and Clarke's admission that he received the two letters from the seventeen unhappy state senators and twenty-five unhappy representatives.

This evidence could be conceivably viewed as not overwhelming in amount. However it was up to the district court to make a credibility call, and Judge Wolf did not believe Dennehy's or Clarke's testimony on the impact of public opinion on their decisions. Credibility calls are something we seldom second guess in this context. Rather we give due regard to the judge's opportunity to assess witness credibility. Fed. R. Civ P. 52(a)(6); Monahan, 625 F.3d at 46. This deference extends to "inferences drawn from the underlying facts, and if the trial

court's reading of the record [with respect to an actor's motivation] is plausible, appellate review is at an end." Janeiro, 457 F.3d at 138-39 (internal quotation marks omitted) (alteration in original).  Here the district court's impression of Dennehy and Clarke's motivations was certainly plausible.  Furthermore, adequate record support for a court's conclusion that "'deliberate indifference' has been established — or an unreasonable professional judgment exercised" — can exist even though that indifference "does not rest on any established sinister motive or 'purpose' to do harm." Battista, 645 F.3d at 455.  It is enough that the district court had a reasonable basis for its perception that the DOC had shown a pattern of "delays, poor explanations, missteps, changes in position and rigidities." Id.  And as we chronicled above, there was ample evidentiary support for this finding.  Finding no clear error, we defer to the district court's assessment of Dennehy's and Clarke's testimony and the other evidence on the issue.

Finally, the DOC offered one last argument to counter the court's finding of deliberate indifference.  Besides the various security concerns it alleged, there was a good amount of testimony from DOC officials and experts that it is not wise to give in to inmate threats of suicide.  The fear seems to be that other inmates will mimic Kosilek's threats of suicide in order to receive some benefit (let's say, desirous medical treatment or a preferable

housing assignment) based on Kosilek's threats in this case. As a general proposition we agree that the DOC should not have to yield to an inmate's threats. However, we do not see Kosilek's particular suicide issue as quite the concern the DOC makes it out to be. First, the evidence was that Kosilek, who had previously attempted both suicide and self-castration, did not manufacture a suicide threat to game the system. Sadly, it is not unheard of for inmates suffering from gender identity disorder to engage in self-destructive behavior. See, e.g., Konitzer v. Frank, 711 F. Supp. 2d 874, 879 (E.D. Wis. 2010) (transgender inmate cut open and wounded his scrotum on multiple occasions while incarcerated); De'Lonta v. Angelone, 330 F.3d 630, 632 (4th Cir. 2003) (transgender inmate stabbed or cut his genitals on more than twenty occasions after the department of corrections stopped his hormone regimen). Second, as far as other inmates are concerned, the DOC admittedly employs competent mental health professionals who can no doubt assess whether an inmate's threats of suicide are real or manufactured. And if they are real, they can be addressed appropriately on an individualized basis. Finally, and more fundamentally, even though deterring other inmates from potentially engaging in undesirable behavior may be a valid penal objective, it is not a reason to withhold medical care that has been deemed medically necessary for a particular inmate. Our ultimate conclusion: the district court did not err in finding the security

rationale submitted by the DOC for not providing Kosilek with surgery largely false and greatly exaggerated.

## VII. CONCLUSION

We are assuredly mindful of the difficult tasks faced by prison officials every day. But as the Supreme Court has cautioned, while sensitivity and deference to these tasks is warranted, "[c]ourts nevertheless must not shrink from their obligation to 'enforce the constitutional rights of all 'persons,' including prisoners.'" Brown v. Plata, 131 S. Ct. 1910, 1928 (2011) (quoting Cruz v. Beto, 405 U.S. 319, 321 (1972) (per curiam)). And receiving medically necessary treatment is one of those rights, even if that treatment strikes some as odd or unorthodox.

Here the trial judge had the opportunity to preside over two lawsuits involving the same players and similar allegations, to hear evidence in this case over the course of a twenty-eight day trial, to question witnesses, to assess credibility, to review a large volume of exhibits, and, in general, to live with this case for twelve years (twenty years if you count Kosilek I). The judge was well-placed to make the factual findings he made, and there is certainly evidentiary support for those findings. Those findings — that Kosilek has a serious medical need for the surgery, and that the DOC refuses to meet that need for pretextual reasons unsupported by legitimate penological considerations — mean that

the DOC has violated Kosilek's Eighth Amendment rights.  The court did not err in granting Kosilek the injunctive relief she sought.

<u>Affirmed</u>.


**-Dissenting Opinion Follows-**

**TORRUELLA, <u>Circuit Judge</u>, Dissenting.** Lest we lose sight of the rule that we are called upon to enforce, stretching it beyond the bounds of its intended purpose, it is perhaps appropriate to begin by reciting the text of the Eighth Amendment: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In applying any rule, precise demarcation of its reach is both appropriate and necessary. Where these boundaries are ignored, the results are most often unforeseen, unintended, and unwarranted. It is only through careful attention to the countervailing interests that prescribe the sweep of a rule that we are best able to identify both those situations that fall clearly within its bounds, and those complexities that skirt along its outermost edges. Such limitations serve more than an exclusionary purpose; by establishing a rule's proper scope, they ensure the effectiveness of its protections when correctly and adeptly applied.

With due respect to the majority, I am forced to dissent because I cannot support what is, in my view, an outcome that proceeds with little recognition of such boundaries. Instead, it allows to stand a decision that, finding its foundation in several erroneous assumptions, reaches a result beyond the limits of our established Eighth Amendment jurisprudence.

## I. Kosilek's History and Treatment

Michelle Kosilek ("Kosilek") is an anatomically male prisoner who suffers from severe gender identity disorder ("GID"). In 1992, Kosilek was convicted of murdering her[32] wife and sentenced to life imprisonment without the possibility of parole. While in prison, Kosilek legally changed her name from "Robert" to "Michelle" and began living as a woman to the extent possible within a male prison environment. Kosilek has previously sought legal redress for what she alleged were constitutional shortcomings in the Commonwealth of Massachusetts's treatment of prisoners with GID. See Kosilek v. Maloney, 221 F. Supp. 2d 156 (D. Mass. 2002). Resolved in 2002, this litigation failed to substantiate any Eighth Amendment violations but ultimately contributed to changes in the care and treatment of GID prisoners, including Kosilek.

Today, the Massachusetts Department of Corrections ("DOC") provides Kosilek with a bevy of ameliorative measures aimed at treating her GID. These measures, as recommended by the DOC's medical advisors, include: psychotherapy, hormone therapy, electrolysis for facial hair removal, and access to female clothing and personal items (including underwear and cosmetics) such as

---

[32]The district court adopted masculine pronouns in reference to Kosilek's anatomical gender. See Kosilek v. Spencer, 889 F. Supp. 2d 190 (D. Mass. 2012). Kosilek, however, self-identifies as female and has undertaken significant efforts, including through treatment provided by the DOC, to formalize this gender presentation. I therefore follow the majority's practice of using female pronouns.

those provided to inmates at MCI-Framingham, Massachusetts's only female prison. The DOC's medical providers, Kosilek's psychiatrist, and Kosilek herself testified as to the positive impact these measures have had on her mental state and self-esteem.

Nonetheless, the district court, validated by the majority in this appeal, has now ordered that the DOC provide Kosilek with sex reassignment surgery ("SRS") to change her male sex organs to female. According to the district court, this surgery is the only adequate medical treatment for the serious risk posed by Kosilek's GID; although Kosilek is not now suicidal, a failure to provide the surgery could result in the deterioration of her mental state and the potential for future self-harm.[33] Consequently, in the district court's mind, any other treatment -- namely, the continued provision of psychotherapy, hormonal treatments, and female attire, in addition to treating any potential suicidality through antidepressants and increased therapy -- is violative of the Eighth Amendment.

## II. The Eighth Amendment

Fundamental to our understanding of criminal sentencing and penological standards is the requirement that "cruel and unusual punishments [not be] inflicted" upon those convicted of a crime. U.S. Const. amend. VIII. In adopting this prohibition,

---

[33]Kosilek has previously attempted suicide and self-castration while in custody. These attempts were made prior to 1992, while Kosilek was awaiting trial on murder charges.

"Americans . . . feared the imposition of torture and other cruel punishments not only by judges acting beyond their lawful authority, but also by legislatures engaged in making the laws by which judicial authority would be measured." Ingraham v. Wright, 430 U.S. 651, 665 (1977) (citing Weems v. United States, 217 U.S. 349, 371-73 (1910)).

Later courts made apparent that the Eighth Amendment's restrictions on criminal punishment also governed the treatment to which prisoners were entitled when they became sick or injured while in custody. After all, where "society takes from prisoners the means to provide for their own needs[,] . . . [a] prison's failure to provide sustenance [and care] for inmates may actually produce physical 'torture or [] lingering death.'" Brown v. Plata, 131 S. Ct. 1910, 1928 (2011) (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)). The Eighth Amendment therefore proscribes medical care that does not rise to the level of "the evolving standards of decency that mark the progress of a maturing society." Estelle, 429 U.S. at 102 (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)).

That appropriate medical care must be provided does not, however, mean that inmates may seek and receive the care of their choosing. United States v. DeCologero, 821 F.2d 39, 42 (1st Cir. 1987). Rather, this worthy pledge of protection is made practicable through the creation of a floor below which the standard of care must not fall. Prison officials commit no

-94-

violation so long as the medical care provided is minimally adequate.  See id.; Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011) (stating that an Eighth Amendment violation occurs when the medical care provided is "so inadequate as to constitute an unnecessary and wanton infliction of pain or [is] repugnant to the conscience of mankind" (quoting Estelle, 429 U.S. at 105-06)).  "[T]his obligation is met in full measure by the provision of . . . services at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards."  DeCologero, 821 F.2d at 43.  This limit on the scope of the Eighth Amendment's protection is clear: care need not be ideal, so long as it is both diligent and within the bounds of prudence.

Neither do all instances of inadequate care constitute constitutional violations.  To substantiate a constitutional claim there must be proof that the government was "deliberately indifferent" to this lack of treatment.  See Battista v. Clarke, 645 F.3d 449, 452 (1st Cir. 2011) (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994); Estelle, 429 U.S. at 104-05).  A finding of deliberate indifference requires two showings.  First, a prisoner must prove his or her medical need is objectively serious.  Mahan v. Plymouth Cnty. House of Corr., 64 F.3d 14, 17-18 (1st Cir. 1995).  A serious medical need is "one that has been diagnosed by a physician as mandating treatment, or one that is so objectively

obvious that even a lay person would easily recognize the necessity for a doctor's attention." Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990) (citations omitted). Second, a prisoner must prove subjective intent to deny care on the part of prison officials. Farmer, 511 U.S. at 837 (reasoning that the Eighth Amendment's prohibition of punishment means that it reaches only the intentional provision of inadequate medical care). Therefore, a prisoner must establish both that an official was "aware of facts from which [an] inference [of a substantial risk of serious harm] could be drawn" and that the official in fact drew the inference. Id. It follows that a showing of ordinary negligence is insufficient to establish a constitutional violation; deliberate indifference requires a level of obstinacy akin to criminal recklessness. Giroux v. Somerset Cnty., 178 F.3d 28, 32 (1st Cir. 1999).

A final boundary delimiting the Eighth Amendment's scope of protection is one founded in the recognition that "security considerations also matter at prisons . . . and administrators have to balance conflicting demands." Battista, 645 F.3d at 454. Therefore, deference is given to the reasonable judgments of prison officials "so long as [those] balancing judgments are within the realm of reason and made in good faith." Id. Although prison officials may "forfeit[] the advantage of deference" when their stated rationales for the rejection of medically prescribed

treatment are pretextual, <u>id.</u> at 455, an assessment of deliberate indifference must still "embrace security and administration, [] not merely medical judgments." <u>Cameron</u> v. <u>Tomes</u>, 990 F.2d 14, 20 (1st Cir. 1993).

### III. Clear Error Review

It is beyond argument that our standard of review in cases such as this one falls upon a continuum, ranging from clear error for questions of pure fact, to <u>de novo</u> for questions of pure law. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Mariano</u>, 983 F.2d 1150, 1158 (1st Cir. 1993). Moreover, resolving Kosilek's claim certainly requires the careful and thorough consideration of innumerable factual findings, including the weighing and assessment of expansive testimony provided by both medical personnel and prison officials. That this element of our task includes a grant of deference to the district court is not in dispute.

Starting from this shared presumption, however, my path quickly diverges from that of the majority. Namely, I take issue with the majority's conclusion that all issues in this case fall squarely on the factual end of our spectrum, and that, consequently, clear error review applies to all elements of the district court's decision, including its ultimate conclusions. Recognizing, as the majority does, that our precedent is far from crystallized on the matter, <u>see</u> <u>ante</u> at 63, I would not be so quick to leave such legal determinations bereft of searching appellate

review.[34]  Neither, I believe, is that the intended result of our

standards.

At a minimum, our court should carefully apply a more

critical eye to the district court's distillation of factual

findings into legal conclusions, reviewing those ultimate

conclusions with significantly less deference.  See, e.g., Hallett

v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) ("The district court's

factual findings regarding conditions at the Prison are reviewed

for clear error.  However, its conclusion that the facts do not

_____

[34]While "no broader review is authorized . . . simply because
this is a constitutional case," see Maine v. Taylor, 477 U.S. 131,
145 (1986), I believe that where such rights are implicated in
cases presenting closely intertwined questions of law and fact our
court would be wise to tread carefully before applying, in toto, a
clearly erroneous standard of review.  Although the Supreme Court
has rejected the application of a higher standard of review in
constitutional cases where the question at hand was one purely of
"historical fact," the Court has not expressly foreclosed
heightened review to other questions involving "legal, as well as
factual, elements."  Hernandez v. New York, 500 U.S. 352, 366-67
(1991).  The majority makes much of the fact that I have previously
explained the existence of a circuit split -- in which the First
Circuit has not taken a side -- regarding whether heightened review
of underlying facts would appropriately apply in cases in which a
right is protected below.  United States v. Frabizio, 459 F.3d 80,
96 (1st Cir. 2006) (Torruella, J., concurring).  Critically,
however, I do not now sound a call for plenary review of what are
wholly factual findings.  Cf. Bose Corp. v. Consumers Union of
U.S., Inc., 466 U.S. 485, 499 (1984).  Rather, I intend a more
general point, cautioning that where factual determinations and
constitutional standards are closely related we ought to carefully
ensure that such subordinate determinations do not erroneously cast
the die of our legal conclusions.  After all, our ultimate
conclusions derive unquestionably from legally operative standards,
and it is undoubtedly the duty of appellate courts to "to clarify[]
[such] legal principles."  Ornelas v. United States, 517 U.S. 690,
697 (1996).

demonstrate an Eighth Amendment violation is a question of law that we review de novo." (citing <u>Campbell</u> v. <u>Wood</u>, 18 F.3d 662, 681 (9th Cir. 1994) (en banc)));[35] <u>Alberti</u> v. <u>Klevenhagen</u>, 790 F.2d 1220, 1225 (5th Cir. 1986) ("[O]nce the facts are established, the issue of whether these facts constitute a violation of constitutional rights is a question of law that may be assayed anew upon appeal."). Any deference must also admit of exception where the trial court bases its findings on an "erroneous interpretation of the standard to be applied," <u>Vinick</u> v. <u>United States</u>, 205 F.3d 1, 7 (1st Cir. 2000) (quotation marks omitted) (quoting <u>United States</u> v. <u>Parke, Davis & Co.</u>, 362 U.S. 29, 44 (1960), for even under deferential review we have a duty to "look carefully . . . to detect infection from legal error," <u>Sweeney</u> v. <u>Bd. of Trs. of Keene State Coll.</u>, 604 F.2d 106, 109 n.2.

While recognizing that the delineation between questions of law and fact is often less than pristine, <u>see</u>, <u>e.g.</u>, <u>Miller</u> v. <u>Fenton</u>, 474 U.S. 104, 113-14 (1985), the inherent difficulty in our task cannot lead to the abdication of our responsibility to identify and strenuously review a district court's conclusions of law, even where those conclusions are not easy to parse from their

---

[35]The majority is correct to note that the Ninth Circuit has found the question of adequate medical alternatives to be one of fact. <u>Snow</u> v. <u>McDaniel</u>, 681 F.3d 978, 988 (9th Cir. 2012). Yet, Ninth Circuit practice includes plenary review of a district court's eventual Eighth Amendment holding. Thus, I seriously question the majority's proclamation that our sister circuit "takes a similar approach" to the one they now advocate.

factual underpinnings.  I cannot agree, therefore, with the majority's failure to undertake any inquiry more searching than that provided by clear error review.[36]

## IV. The District Court's Conclusions

In its review, the district court undertook to answer five distinct questions which, when answered in the affirmative, it found substantiated a constitutional violation deserving of remedy. These were: (1) whether Kosilek had a serious medical need; (2) whether SRS was the only adequate treatment for that need; (3) whether the DOC knew Kosilek was at high risk of serious medical harm absent SRS; (4) whether the DOC's denial of treatment was made in bad faith or for pretextual reasons; and (5) whether the DOC's conduct, if found to be unconstitutional, would continue in the future.

In my view, by parsing the issue into such discrete, hermetic questions, the district court's opinion artfully shielded from review the complex and oft-interrelated nature of our Eighth

---

[36]The majority notes that our court has previously upheld a finding of deliberate indifference where the district court had a "reasonable basis" for its finding. Battista, 645 F.3d at 455. That same opinion, however, made clear that a finding of deliberate indifference was appropriately "reviewed on appeal more closely than [] district court fact-finding." Id. at 454 (citations omitted). While the majority admits of this subtlety, see ante at 64, its review then appears to abdicate such nuance and apply maximum deference throughout. In any case, where, as here, the district court's determinations were infected by various errors as described below, I believe the majority presumes too much regarding their reasonableness.

Amendment inquiry.  See Leavitt, 645 F.3d at 498 ("[T]he subjective deliberate indifference inquiry may overlap with the objective serious medical need determination; similar evidence, including evidence of adverse effects, may be relevant to both components." (internal quotation marks and citation omitted)); DesRosiers v. Moran, 949 F.2d 15, 18-19 (1st Cir. 1991) (recognizing that "[i]n practice" the objective and subjective components of our deliberate indifference standards "may overlap or merge").  In treating Kosilek's contentions, therefore, I adopt our court's past practice of assessing the district court's "several subordinate findings" in a more holistic manner.[37]  Battista, 645 F.3d at 452.  This approach gives due recognition to the fact that "[m]edical need' in real life is an elastic term,"  id. at 454, and acknowledges that any determination of a treatment's adequacy must carefully balance the many competing concerns faced by prison officials.  I begin with a discussion of the district court's errors, as I see them.

## A. Prudent Medical Care

The district court faced a question about the practice of prudent medical professionals that, at its crux, hinged on whether the DOC's preferred treatment plan -- advocated by Dr. Schmidt -- was a medically adequate response to Kosilek's GID.  Ultimately,

---

[37]That GID is a serious medical condition is not contested. Further, the fifth question need only be reached upon establishing a constitutional violation, for the purposes of crafting a remedy. Therefore, I focus on only the second, third, and fourth questions presented.

the district court, in a decision now upheld by the majority, determined that Dr. Schmidt was not a prudent professional, based largely on his statements of equivocation regarding use of the Harry Benjamin Standards of Care (the "Standards of Care" or the "Standards"). Indeed, Dr. Schmidt testified that he viewed the Standards as "guidelines." He also made clear that he found the protocol laid out on the Standards of Care "very useful for patients," and that he "referr[ed] [patients] to the protocol and ask[ed] them to become familiar with them." As to SRS, Dr. Schimdt stated that he "neither advocate[s] for nor . . . speak[s] against the decision[]." Instead, he "leaves[s] the decision-making in the hands of the patients." This is far from what the district court, now affirmed by the majority, characterizes as an outright rejection of the Standards' applicability.

Still, the district court took particular issue with Dr. Schmidt's practice of not writing letters of recommendation for patients seeking surgery. The district court's concern was predicated on its belief that letters of recommendation are required by the Standards of Care, and "[a]ccordingly, prudent professionals . . . write such letters." Kosilek, 889 F. Supp. 2d at 233. This reasoning contains an inferential leap. That there is a predicate requirement to a medical procedure does not lead inexorably to the conclusion that prudence mandates assisting patients to meet that requirement. For instance, if a surgery

-102-

could not be conducted on an individual under a particular age without several letters of recommendation, a medical professional who refused to write such a letter based on their understanding of that treatment's appropriateness for youths would not be, necessarily, imprudent.

In affirming the district court's finding that Dr. Schmidt was not prudent, the majority also assigns significant weight to the fact that, despite having treated approximately 300 individuals with GID, Dr. Schmidt does not appear to believe surgery was ever "medically necessary." The majority disparages this belief as clearly contrary to the Standards of Care, and therefore clearly imprudent. Yet, again, Dr. Schmidt admits to using the standards for guidance and to "maintain[ing] a neutral position" on surgery. At the request of his patients, he also released medical files to surgeons and wrote letters indicating, where appropriate, that there were no contra-indications to surgery. His testimony regarding his disagreement that surgery was medically necessary stemmed from his belief that patients exhibiting particularly high levels of distress often suffer from co-morbid conditions that require treatment in their own right.

Moreover, the Standards of Care themselves admit of just this sort of flexible application, not simply strict adherence. The first page of the Standards of Care states unequivocally that, "[t]he Standards of Care are Clinical <u>Guidelines</u>;" it continues on

to make clear that the Standards are "intended to provide flexible directions" and that "[a]ll readers should be aware of the limitations of knowledge in the area."  Standards of Care at 1 (emphasis added).  But see Kosilek, 889 F. Supp. 2d at 236 (citing O'Donnabhain v. Comm'r, 134 T.C. 34, 45 (U.S. Tax Ct. 2010)) (relying on O'Donnabhain's rejection of any characterization of the Standards of Care as "guidelines" as imprudent). The Standards of Care further provide that "[i]ndividual professionals and organized programs may modify them."  Standards of Care at 2.  This much was made clear in Dr. Levine's testimony:

> [T]he "Standards of Care" was a consensus document from people from seven different countries or something, you know, who come from different systems, and it was a political process that forged together a set of standards . . . . So "prudent" is a wonderful word, but it's not like it has one simple definition.

In fact, Dr. Levine, who was an independent expert hired by the district court, expressly stated in his initial report that, while not popular, Dr. Schmidt's view was within "prudent professional standards."  In its opinion, however, the district court took significant pains to recast this finding, dismissing it as erroneous based on Dr. Levine's purported refusal to testify, at least initially, as to how a medically prudent professional would act if all countervailing interests were set aside.  In other words, the court required Dr. Levine to presume that a patient had fully met all the readiness criteria in the Standards of Care and

-104-

faced no other extrinsic obstacles to surgery (such as money, safety, or external pressure).  The district court then hung its hat on the fact that, "[e]liminating these considerations and any security concerns, Dr. Levine opined that a prudent professional would not <u>deny</u> Kosilek sex reassignment surgery."  <u>Kosilek</u>, 889 F. Supp. 2d at 235 (emphasis added).

Medical prudence, however, does not exist in a bubble, and a standard of minimal adequacy must inherently admit of conditions that are less than ideal.  <u>See</u> <u>Rhodes</u> v. <u>Chapman</u>, 452 U.S. 337, 367 (1981) (Brennan, J., concurring) ("[C]ases are not decided in the abstract.  A court is under the obligation to examine the <u>actual effect</u> of challenged conditions . . . .").  In fact, Dr. Levine's testimony recognizes just such nuance -- even if the district court's reading of it does not.  Dr. Levine stated that while prudent professionals would not deny SRS to eligible individuals, "life, [and] reality" sometimes would.  In those instances, <u>prudent</u> professionals "bring to bear" the same methods described by Dr. Schmidt to otherwise alleviate the individual's symptoms of GID.[38]

---

[38]In my reading, Dr. Schmidt never counseled for denying surgery.  His testimony suggested deference to a patient's choice and willingness to release medical records to qualified surgeons. He then expressed concern as to whether a prisoner could ever meet readiness criteria for surgery, noting disagreement with the district court's presumption that a real-life experience could necessarily occur behind bars.  Although admonishing Dr. Schmidt for purportedly ignoring the Standards of Care, the district court discredited his testimony in part based on this expression of

Nonetheless, the district court suggested that portions of Dr. Levine's testimony might be properly "disregard[ed]" based on the purported change in his opinion. Kosilek, 889 F. Supp. 2d at 234 n.15. I see no merit in this assertion, and moreover believe that it evidences the district court's troublesome practice of rejecting testimony -- even the testimony of an impartial, court-appointed expert -- where it explored the very real nuances implicit in defining prudent care. For one, the reason for any such "change" is clearly evidenced in the record: the district court demanded it. For another, Dr. Levine's testimony, even after he was admonished for undertaking an assessment recognizing the realities in which GID patients live, was not inconsistent.

He began, in his written report, by stating that Dr. Schmidt's method, while not preferred, was prudent. In later testimony, after specifically predicating his statement with an acknowledgment that "the 'Standards of Care' [] have to be interpreted . . . by the life of the environment in which Michelle Kosilek is going to live," Dr. Levine again concluded that Dr. Schmidt's proposed treatment was not "imprudent." The following exchange then occurred:

_____

concern regarding whether a real-life experience -- a key component of those Standards -- could occur in prison. See Kosilek, 889 F. Supp. 2d at 235. In fact, in combination with the district court's insistence that Dr. Levine ignore questions regarding this real-life experience and instead presume that the experience necessarily can and did occur, this suggests a purposeful tipping of the testimonial scales away from an area of potentially worthy inquiry.

> THE COURT: But is this an area in which you think prudent professionals can reasonably differ as to what is at least minimally adequate treatment for this condition?
> [DR. LEVINE]: Yes, and do.

Therefore, in addition to finding no internal inconsistencies in Dr. Levine's expert testimony, see Mitchell v. United States, 141 F.3d 8, 17 (1st Cir. 1998), I disagree that he ever testified to Dr. Schmidt's proposed method of care being outside professional standards. At his most negative, Dr. Levine stated that Dr. Schmidt's proposal would be "uncompassionate" and "unpopular." At his most mincing, he referred to Dr. Schmidt's proposed method of care as "not exactly imprudent."[39] As such, the district court's proffered conclusion that Dr. Levine found Dr. Schmidt's proposal unreasonable is unsupported by the record. Insofar as the majority now affirms the same, erroneous reading, I find their conclusion to be equally flawed.

## B. Serious Risk

It is undisputed that surgery for Kosilek would be an appropriate option for treating her GID. This fact is far from determinative, however, of whether a choice not to provide the surgery gives rise to a deprivation of constitutional magnitude. See Cameron, 990 F.2d at 20 (finding that prison officials are not

---

[39]This admittedly unenthusiastic endorsement referenced Dr. Schmidt's proposed treatment presuming that there was a total absence of countervailing factors to consider in developing a treatment plan.

"bound to do what the doctors say is best . . . even if the doctors are unanimous"). If an alternative short of surgery is still sufficient to address, with minimal adequacy, Kosilek's medical need, no constitutional claim can arise. See DeCologero, 821 F.2d at 43.

The district court reasoned, however, that any treatment except surgery is necessarily inadequate, given that Kosilek's medical providers testified to a likelihood that a denial of surgery would significantly increase Kosilek's risk of severe emotional distress, potentially manifesting in self-harm. Moreover both the district court and majority rejected, as violative of the Eighth Amendment, the DOC's plan to treat any symptoms of heightened distress and suicide ideation with additional psychotherapy and the possible use of antidepressants.

This conclusion rests on an artful -- and in my mind erroneous -- compartmentalization of the DOC's preferred treatment plan. The district court seeks to draw a clear line between the cause of Kosilek's distress (GID) and her symptoms (emotional distress and possible suicide ideation).[40] In support of the same reasoning, the majority cites a Seventh Circuit case for the

---

[40]It is rare, to my understanding, that medical treatments may so neatly and completely delineate between symptom and disease. Certainly, were a patient to present with signs of both obesity and severe hypertension, it is an uncommon doctor that would disparage a peer for prescribing blood-pressure medication, although designed no doubt to treat a symptom.

proposition that "psychotherapy as well as antipsychotics and antidepressants . . . do nothing to treat the underlying disorder [of GID]." See Fields v. Smith, 653 F.3d 550, 556 (7th Cir. 2011). Critically, however, in Fields the prisoner was denied any hormonal treatment, meaning that the court was called on to resolve a question of whether psychotherapy and antidepressants alone could sufficiently treat GID. In contrast, here the question was whether the continued provision of all ameliorative measures currently afforded Kosilek in addition to antidepressants and psychotherapy would be constitutionally adequate.

Indeed, the DOC's proposed method of treating Kosilek's distress and desire to self-harm cannot be assessed piecemeal, but must be addressed in light of Kosilek's entire course of treatment. Were surgery not provided, the provision of psychotherapy, hormones, electrolysis, and female clothing and cosmetics would continue to represent a very real and direct treatment for Kosilek's GID. Moreover, although she remains distressed, Kosilek admits that the DOC's current treatment regimen has led to a significant stabilization in her mental state. Kosilek's doctors testified to the same, highlighting her "joy around being feminized." This claim is also borne out by the long passage of time since she exhibited symptoms of suicide ideation or attempted to self-castrate. The provision of additional, supplemental care specifically targeting her risk of suicide cannot, in my reading,

-109-

render that treatment, which has successfully mitigated her symptoms for nearly a decade, suddenly inadequate.[41]

What is clear from the record is that the DOC has provided Kosilek with care sufficient to decrease her levels of distress and manage her desires to self-harm. On the whole, this suggested course of treatment appears tailored to Kosilek's current symptoms and adequately prepared to address her future ones in a manner that is in no way "so inadequate as to shock the conscience." Torraco v. Maloney, 923 F.2d 231, 235 (1st Cir. 1991) (internal quotation marks omitted) (quoting Sires v. Berman, 834 F.2d 9, 13 (1st Cir. 1987); see also DeCologero, 821 F.2d at 43 (finding that care is adequate where it is "reasonably commensurate with modern medical science").

## C. Security Concerns

In issues of security, "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and

---

[41]The Massachusetts DOC has recently undertaken a significant effort to ensure it is well-prepared to address the needs of prisoners exhibiting symptoms of suicidality. See Disability Law Ctr. v. Mass. Dep't of Corr., C.A. No. 07-10463-MLW, 2012 WL 1237760 (D. Mass. Apr. 12, 2012). I see nothing to suggest such care, if provided, would not itself be thorough and adequate. Moreover, it bears consideration that Kosilek is not currently suicidal and that although her medical providers suggest a likelihood that suicide ideation will reemerge if SRS is not provided, there is no indication as to the severity, duration, or even sole causal factors of this potential result. As Dr. Levine testified, the presumption that Kosilek may become suicidal must also recognize the potential that this impulse is not stagnant, but might naturally -- and with the assistance of therapy -- dissipate or "evolve over time."

execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  Bell v. Wolfish, 441 U.S. 520, 547 (1979).  Although we cannot "abdicate our responsibility to ensure that the limits imposed by the Constitution are not ignored," Blackburn v. Snow, 771 F.2d 556, 562 (1st Cir. 1985), we do not sit to substitute our own judgment for that of prison administrators. Nonetheless, believing that the DOC's cited security concerns were mere pretext, the district court declined to afford them weight. Kosilek, 889 F. Supp. 2d at 247.  The majority affirmed this denial; a decision that I believe ignores the very real security issues presented by the DOC.

That various security concerns might arise in the context of a prison setting in which a post-operative, male-to-female transsexual is housed with male prisoners takes no great stretch of the imagination.[42]  In fact, nearly every case to consider the provision of medical care to prisoners at some point relies on the Supreme Court's 1994 decision in Farmer v. Brennan, 511 U.S. 825 (1994).  In that case, an Eighth Amendment claim was predicated on

_____

[42]I find the DOC's concerns regarding Kosilek's post-operative housing significant.  I do not, however, dispute the district court's finding, affirmed by the majority, that any security concerns regarding Kosilek's ability to escape custody while being transported for surgery are, at best, extremely minimal.  Prison officials have significant experience transporting prisoners, and both Kosilek's age and history of good behavior counsel in favor of safe transport.

prison officials' failure to provide (in part through segregation) for the safety of a <u>pre</u>-operative transsexual. <u>Id.</u> at 847. The court reasoned that by knowingly allowing the petitioner to remain in general custody at a male prison despite his feminine body shape, clothing, and slight stature, prison officials could illustrate the sort of subjective indifference necessary to sustain an Eighth Amendment claim. <u>Id.</u>

Despite the obviousness of such risks, the majority reasons that no clear error occurred, in part because the DOC's security review of MCI-Norfolk was started, completed, and submitted in a matter of weeks. With speed, it suggests, comes inadequacy. I am not so ready to adopt that presumption. The record shows that all involved parties met for the first time on May 19, 2005, to discuss a report that was due by May 27, 2005. That this was their first meeting, however, does not necessarily mean that it was the first instance in which the various individuals considered the issues and questions implicit in ensuring a safe environment for prisoners undergoing treatment for GID.

The district court and the majority also highlight the fact that experts retained by the DOC were not wholly knowledgeable about Kosilek's personal characteristics, such as age and record of good behavior. Although this shortcoming in their knowledge was not ideal, I cannot credit any presumption that these lapses

rendered the experts unable or unqualified to speak to the general security concerns created by housing a post-operative transsexual in a prison's general population. Kosilek's record of good behavior, for instance, has no bearing on an assessment of whether other prisoners might threaten or harm her based on her post-operative anatomy and gender presentation.

Further, in reaching its conclusion the district court stated that "the DOC [could] reasonably assure the safety of Kosilek and others after sex reassignment surgery by housing Kosilek in a segregated protective custody unit." Kosilek, 889 F. Supp. 2d at 243. Yet, the court also warned that "it may foreseeably be argued that keeping Kosilek in segregation is unnecessary and a form of extrajudicial punishment that is prohibited by the Eighth Amendment." Id. at 245. The tension between these statements is clear, and the district court's proffer that we disregard security concerns based on the existence of a possibility for segregated housing appears unreasonable when, in short turn, they assert that such a course of action would violate the Constitution.

The majority defends the district court's determination in part by noting that Kosilek may continue to be housed in MCI-Norfolk's general population where no security issues have arisen during her tenure. The fact that no such issues have arisen in the past, however, does not necessarily render inappropriate or

-113-

unreasonable the DOC's concerns that issues might present themselves in Kosilek's post-operative future. Certainly, courts cannot and should not strip from prison officials the ability to consider and implement prophylactic solutions to foreseeable issues reasonably within the scope of their security expertise. In fact, such a retroactive style of administration would, in itself, seem to amount to just the sort of indifference to credible threats of harm that might constitute a constitutional violation. See Cortés-Quiñones v. Jiménez-Nettleship, 842 F.2d 556, 558 (1st Cir. 1988) (stating that prison officials have a duty to take reasonable measures to protect prisoners from harm).

Ultimately, in a feat of conclusory reasoning, the district court overlooked the legitimacy of the DOC's concern based on its belief that the decision to deny SRS was a response to "public and political criticism."[43] Kosilek, 889 F. Supp. 2d at 240. The evidence on record tending to support this theory includes a press appearance by Commissioner Dennehy, negative news coverage regarding Kosilek's request for surgery, and letters received by the DOC from members of the Massachusetts legislature.

_____

[43]Perhaps cognizant of the inferential leap made by the district court, see ante at 85, the majority places greater emphasis on other rationales mentioned by the district court. The district court's opinion, however, makes clear that its conclusion rested predominantly on concern about public opinion. Kosilek, 889 F. Supp. 2d at 240 ("[T]he defendant has refused to provide . . . [SRS] in order to avoid public and political criticism. This not a legitimate penological purpose. Therefore, the defendant's conduct . . . violates the Eighth Amendment.").

Surely, this evidence provides ample support for the fact that public criticism existed and was leveled at the DOC, both by the media and politicians.  It in no way, however, proves the DOC's reasons for denying Kosilek's request or shows that this denial was motivated specifically by the public outcry.

In any case, even if the district court's finding that public criticism played a role in shaping the DOC's decision is accepted wholesale,[44] this finding might at most counsel for the DOC to lose "the advantage of deference."  Battista, 645 F.3d at 455 (emphasis added).  It cannot, however, suddenly render superfluous the very real concerns the DOC expressed about housing Kosilek after her operation.  I find no license in the record for the district court to have wholly dismissed the validity of these concerns.

### V. Kosilek's Eighth Amendment Claim

Having set forth my disagreements with the district court's conclusions regarding the scope of medical prudence, the potential for adequate treatment short of surgery, and the DOC's security concerns, I turn to the task of determining whether Kosilek has proven deliberate indifference to a serious medical need.  Cameron, 990 F.2d at 20 ("Indeed, when it comes to

_____

[44]As the majority notes, credibility determinations of this type are given particular deference by our court. See ante at 85-86.  Thus, while I see no extrinsic support in the record, I recognize I cannot equal the district court's ability to hear and weigh testimony.

constitutional rights, none of the professionals has the last word. Professional judgment, as the Supreme Court has explained, creates only a 'presumption' of correctness; welcome or not, the final responsibility belongs to the courts." (citing Youngberg v. Romeo, 457 U.S. 307, 323 (1982)).  As a starting point, this review must embrace the many competing concerns, including those relevant to prison administration, that are inherent in our constitutional inquiry, for there is "[n]othing in the Constitution [that] mechanically gives controlling weight to one set of professional judgments." Id.

What is clear is that the DOC has, for several years, provided Kosilek with significant treatment for her GID.  Equally clear is that this treatment has resulted in marked improvement in Kosilek's mental state and contentment.  She is not currently suicidal, and all reported instances of self-harm occurred two decades ago, long prior to her current course of treatment.  The DOC also stands prepared to offer additional psychiatric services should Kosilek begin exhibiting signs of suicidality.  I can see no violation on these facts.  Not performing surgery is not the most compassionate solution to Kosilek's GID.  Neither, however, does it fall outside the scope of clear professional standards, DeCologero, 821 F.2d at 43, or illustrate severe obstinacy and disregard of Kosilek's medical needs, DesRosiers, 949 F.2d at 19 ("[T]he

-116-

complainant must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain." (citations omitted)).

Kosilek is receiving, and would continue to receive, a regimen of treatment that mitigates the severity of her GID. This treatment is far from the proverbial "aspirin" doled out to a cancer patient in lieu of chemotherapy. <u>See</u> <u>ante</u> at 71. Rather, the DOC has for years ensured an individualized treatment plan for her physical and mental needs as well as consistent access to a team of specialists. I do not see in this treatment, nor does the district court or majority make clear, any "reasonable basis," <u>see</u> <u>ante</u> at 66, for a finding of wanton disregard. <u>Giroux</u>, 178 F.3d at 32 (requiring a level of "excessive risk" like that of criminal recklessness); <u>DesRosiers</u>, 949 F.2d at 19. Rather, giving due consideration to countervailing security concerns and based on a review of the record that shows the DOC's proposed care was not outside the realm of professionalism, I cannot say that the DOC has failed to adequately care for Kosilek's GID or callously ignored her pain. <u>Feeney</u> v. <u>Corr. Med. Servs., Inc.</u>, 464 F.3d 158, 162 (1st Cir. 2006) ("The care provided must have been 'so inadequate as to shock the conscience.'" (quoting <u>Torraco</u>, 923 F.2d at 235)).

Facing litigation that was equally protracted and passionate, the district court's task was by no means a simple one. The complexities of this case were many, and the testimony considerable. I am convinced, however, that the district court

-117-

ultimately erred in several key respects, skewing its factual conclusions towards a result, now upheld by the majority, that is beyond the boundaries of our accepted legal precedent.

The Eighth Amendment proscribes punishment, including punishment in the form of medical care so unconscionable as to fall below society's minimum standards of decency.  See Wilson v. Seiter, 501 U.S. 294, 300 (1991); Estelle, 429 U.S. at 102.  Its boundary simply does not reach, however, to instances of care that, although not ideal, illustrate neither an intent to harm nor the obstinate and unwarranted application of clearly imprudent care.  Respectfully, I would reverse.